# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ALISSA FREDRICKS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |  CIVIL ACTION NO. |
| MARKEL CATCO INVESTMENT MANAGEMENT LTD AND MARKEL CORP., | ) ) ) ) |
| Defendant. | ) ) ) |

## COMPLAINT AND JURY DEMAND

Plaintiff Alissa Fredricks ("Plaintiff") brings this Complaint against Markel CATCo Investment Management Ltd ("Markel CATCo") and Markel Corp. ("Markel" or, collectively with Markel CATCo, "Defendants").

## OVERVIEW

1.     This action arises from the improper and unlawful actions of Markel and its wholly-owned subsidiary Markel CATCo, as well as others acting at Markel's behest, through which Defendants have refused to make incentive payments to Plaintiff in the amount of $7,450,000, all of which became due and owing upon the occasion of the termination of her employment without cause.  The action further arises from efforts undertaken by Defendants to tarnish Plaintiffs' reputation in order to prevent her from competing with Defendants in the future.  Defendants have used unlawful, unfair and deceptive means to achieve these ends.  Such conduct has included without limitation wrongfully terminating Plaintiff's employment without

cause on pretextual grounds; attempting to justify the wrongful termination by amending a corporate policy after the fact to make previous conduct improper; invading her privacy by accessing highly personal information without authorization, and then using such highly personal information to cause public embarrassment, injury to reputation, and emotional distress; implying in a public announcement that the termination somehow related to an on-going Government inquiry of Markel CATCo, when in fact the events were unrelated;  and, conducting all such activities, maliciously, intentionally, with reckless disregard for the truth, and/or negligently, thereby causing irreparable and foreseeable harm to Plaintiff and her good reputation.

2.      In May 2016, Markel CATCo hired Plaintiff to work as a Senior Actuary in its office in Wellesley, Massachusetts.  Plaintiff's principal residence was then, and is now, in Massachusetts, although a period of her work for Markel CATCo was in Bermuda.  Plaintiff is skilled in astrophysics, actuarial science and catastrophe risk modeling; and it quickly became clear to many at Markel CATCo and Markel that she had the potential for significant promotions to leadership positions, including as successor to Markel CATCo's then Chief Executive Officer Anthony Belisle ("Mr. Belisle").  Plaintiff signed various employment-related agreements over time, the last of which was the  "Addendum to Employment Agreement" executed on October 19, 2018 and attached hereto as Ex. 1 (the "Addendum").  The Addendum replaced the previous "Schedule 2 Incentive Compensation," and governs Plaintiff's incentive compensation structure, which included, among other elements, a Continued Service Bonus ("CSB") and a Retention Bonus ("RB") (collectively, the "Incentive Payments").

3.      The CSB was in the total aggregate amount of $450,000 to be earned in three non-equal segments if Plaintiff remained actively and continuously employed in good standing on

December 31 of 2018, 2019, and 2020.   In the event that her employment was terminated without cause before December 31, 2020, she was contractually entitled to receive any unpaid portion of the CSB with thirty days of the termination date.

4.      The RB, in the gross amount of $7,000,000 was to be paid in full on March 31, 2019, with vesting on a prorated monthly basis, and final vesting on March 31, 2021.   In the event that Plaintiff's employment was terminated without cause, she was contractually entitled to full vesting and to retention of the full bonus with no claw-back rights on the part of Defendants.

5.      The funds for the CSB came, not from Defendants, but from funds allocated by Mr. Belisle from his own incentive payments from Markel CATCo.   Each year, Mr. Belisle determined the recipients and the amount to be allocated to key employees, obtained Markel's sign-off, and provided a spreadsheet of approved payments to Markel CATCo for distribution (the "Belisle Allocations").   The last of his incentive payments, in the amount of $65,950,000 after earmarking the Belisle Allocations, vested on December 31, 2018 and was to be paid by January 30, 2019.

6.      The funds for Plaintiff's RB also came, not from Defendants, but from the Belisle Allocations.   The $7,000,000 RB was in recognition of her role as Mr. Belisle's presumed successor.

7.      Thus, Mr. Belisle provided the funds from his own guaranteed incentive payments for Plaintiffs' Incentive Payments in the amount of $7,450,000.   Markel approved the allocations, and Markel CATCo contractually guaranteed the payments in the Addendum.

8.      As the January 30, 2019 deadline approached for Markel CATCo to make the last incentive payments to Mr. Belisle in the amount of $65,950,000, Markel used its ownership of Markel CATCo to contrive a scheme to cause Markel CATCo to terminate Plaintiff's and Mr.

Belisle's employment, purportedly for cause, before January 30.  In this way, Markel and Markel

CATCo avoided payment of Mr. Belisle's $65,950,000, and Plaintiff's vested $125,000 CSB

payment.  In addition, Markel and Markel CATCo avoided Plaintiff's $7,000,000 RB due weeks

later on March 31, 2019, and Plaintiff's remaining $325,000 CSB due over time, or immediately

in the event of termination without cause.   Had Markel and Markel CATCo terminated only Mr.

Belisle's employment, Markel CATCo would still have owed Plaintiff $7,450,000 in CSB and

RB from the Belisle Allocations,  pursuant to the Addendum.

9.     The scheme contrived by Markel to cause Markel CATCo to terminate Plaintiff's

and Mr. Belisle's employment included the following:  On January 18, 2019, Markel unilaterally

and without notice reconstituted the Markel CATCo Board with five of its own captive directors,

thereby giving Markel instant control of the Board and the ability to terminate Plaintiff's and Mr.

Belisle's employment.   All of Mr. Belisle's remaining incentive payments and a portion of

Plaintiff's Incentive Payments had already vested on December 31, 2018. All of Plaintiff's

Incentive Payments were due and owing within thirty days of termination if Plaintiff were

terminated without cause.   Defendants claimed that the terminations were "for cause," and were

based upon an undisclosed personal relationship between Plaintiff and Mr. Belisle.   Once the

terminations were announced, Markel refused to satisfy, or to allow Markel CATCo to satisfy,

the payment obligations to either Plaintiff or Mr. Belisle, including those that had already vested

on December 31, 2018.

10.    In conjunction with the termination of Plaintiff's employment, in a manner that

ensured that Plaintiff and Mr. Belisle would be critically impeded from competing with Markel

or Markel CATCo in the future, Markel publicly announced the purportedly for-cause

termination, disclosed the personal relationship as the grounds, and simultaneously falsely

intimated that the terminations were somehow related to a Government inquiry of Markel CATCo that had been in process since November 30, 2018 relating to loss reserves. The terminations in fact had nothing to do with the on-going Government inquiry.

11.     Plaintiff now brings this action to enforce her rights under the Addendum, and to recover for additional damages suffered as a result of Defendants' tortious conduct.

## PARTIES

12.     Plaintiff is a citizen of the United States whose principal residence is in Barnstable County, Massachusetts.

13.     Defendant Markel CATCo Investment Management Ltd. ("Markel CATCo") is a Bermuda exempted reinsurance investment company. Markel CATCo's principal place of business is in Hamilton, Bermuda, and it conducts business all over the world. Markel CATCo is a party to the Addendum.

14.     Defendant Markel Corporation is a corporation organized under the laws of the Commonwealth of Virginia. Markel's principal executive offices are located in Glen Allen, Virginia and it likewise conducts business all over the world, including in Massachusetts. As the 100% owner of Markel CATCo, and by virtue of taking over the Markel CATCo Board of Directors on or about January 17 or 18, 2019 in order to terminate Plaintiff's and Mr. Belisle's employment, Markel is an alter ego to, or the principal in a principal/agent relationship with, Markel CATCo.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants.

Markel and Markel CATCo are citizens of a different state and a foreign state, respectively, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

16.     This Court has personal jurisdiction over Defendant Markel CATCo, at a minimum with respect to this Action because:

    a.  Markel CATCo solicited Plaintiff for employment in Massachusetts, negotiated employment contracts with Plaintiff in Massachusetts, and employed Plaintiff in Massachusetts from the beginning of her employment in May 2016 through March 2017 .

    b.  Markel CATCo has published defamatory statements and private facts regarding Plaintiff to a global audience, causing harm to the personal reputation of Plaintiff, a Massachusetts resident, and to the business reputation of Plaintiff with respect to her professional and personal acquaintances, especially including within her state of residence.

    c.  Markel CATCo has availed itself of the laws of Massachusetts by, among other things, regularly soliciting and doing business with institutional investors within Massachusetts.  Plaintiff conducted business, on behalf of Markel CATCo and within the scope of her employment, with investors in Massachusetts.

17.     This Court has personal jurisdiction over Defendant Markel because:

    a.  On information and belief, Defendant Markel underwrites specialty commercial insurance policies on a national basis, with regional sales personnel dedicated specifically to a region that includes Massachusetts residents.     Markel's   wholly   owned   subsidiary,   Markel   Service,

Incorporated, is licensed with the Massachusetts Secretary of the Commonwealth to conduct business as a foreign for-profit corporation and is described as an insurance brokerage.

b.   Markel is the alter ego of its wholly owned subsidiary, Markel CATCo, particularly after seizing control of the Markel CATCo Board for the purpose of terminating the employment of Markel CATCo's CEO Mr. Belisle and Markel CATCo's CEO-Bermuda and CEO designate Plaintiff.

c.   Markel published defamatory statements regarding Plaintiff to a global audience, causing harm to the personal reputation of Plaintiff, a Massachusetts resident and to the business reputation of Plaintiff with respect to her professional and personal acquaintances especially within her state of residence.

18.   Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2, 3), 1391(c)(3) because a substantial part of the events giving rise to the claim occurred in this district, because Defendants Markel and Markel CATCo are subject to personal jurisdiction in this district with respect to this action, because Defendant Markel CATCo is a foreign entity not resident in the United States, and because Plaintiff is a United States citizen and Massachusetts resident whose contacts with Bermuda will completely end within a matter of weeks when her lease expires on March 31, 2019 and her work permit expires on March 15, 2019.   In addition, the "Governing Law; Venue" provision in the Addendum, while providing that the Addendum shall be governed by Bermuda law, further provides only that the parties agree to submit to the jurisdiction of the Supreme Court of Bermuda.   In contrast to exclusive forum-selection provisions in other contracts between Plaintiff and Markel CATCo, under which she expressly does not sue, the

parties did not agree to an exclusive forum.   All other factors, including the wrongful conduct of a foreign entity against a U.S. citizen who resides in Massachusetts, favor venue here.

19.     Markel CATCo agreed to an exclusive forum selection clause in New Hampshire in the employment contract of Mr. Belisle, and Mr. Belisle's corresponding lawsuit is filed there, indicating that venue in the northeastern United States is not a burden upon Markel CATCo when contracting with one who has the bargaining power to insist upon it.

## STATEMENT OF FACTS

### A.     *Plaintiff's Employment.*

20.     Mr. Belisle conceived of, and participated in the establishment of, CATCo in July 2010, in conjunction with owner QIC, a Qatari entity.   In each of the first six years of its existence, CATCo averaged double digit annual returns for its investors.   On September 9, 2015, QIC completed the sale to Markel of substantially all of the assets of the two related companies that Mr. Belisle and QIC had founded – CATCo Investment Management Ltd. ("CATCo") and CATCo-Re Ltd.   CATCo was an insurance-linked securities investment manager and reinsurance manager focused on building and managing highly diversified, collateralized retrocession and reinsurance portfolios covering global property catastrophe risks.   CATCo-Re Ltd. was a provider of reinsurance protection.

21.     As noted above, in May 2016, Markel CATCo hired Plaintiff as a Senior Actuary, working out of an office in Wellesley, Massachusetts.   Plaintiff, who is skilled in astrophysics, actuarial science and catastrophe risk modeling, among other things, quickly rose through the ranks at Markel CATCo.   As early as July 2016, Mr. Belisle first discussed with Plaintiff the possibility of moving to Bermuda to ultimately take over as the Bermuda Chief Executive Officer of Markel CATCo.   As early as December 2016, Mr. Belisle identified Plaintiff as his

likely successor in an email to Markel's Co-Chief Executive Officer Richard Whitt III.  Such events substantially preceded the personal relationship referenced below.

22.     On December 21, 2016, Plaintiff negotiated and executed an agreement in Massachusetts to become the Chief Risk Officer of Markel CATCo.

23.     In March of 2017, Plaintiff rented a residence in Bermuda in connection with her role of Chief Risk Officer and worked from that office.

24.     Soon thereafter, the officers of Markel CATCo and Markel began discussions about Plaintiff ultimately assuming the role as Chief Executive Officer – Bermuda.  In May 2017, Mr. Belisle emailed Markel co-CEO Richard Whitt stating his plan is to promote Plaintiff to the role of CEO-Bermuda within the next year.  This, too, preceded the personal relationship referenced below.

25.     Plaintiff was formally appointed as Chief Executive Officer – Bermuda in November 2017.

26.     Plaintiff and Mr. Belisle consistently demonstrated the highest levels of success in performing their duties.  This was largely due to the accomplishments of Plaintiff and Mr. Belisle, who travelled extensively worldwide to raise $2.3 billion of new capital in the Fall of 2017 and an additional $600 million during 2018, following a series of natural disasters that made such new capital critical to Markel CATCo's continued success.  This has been quoted as one of the largest individual capital raises in the Insurance Linked Securities ("ILS") market history.  Not only did Plaintiff and Mr. Belisle perform their jobs well, their capital raising achievements were unprecedented in the history of their industry.

27.     As of December 31, 2018, the combined assets under management ("AuM") of the funds managed by Markel CATCo had grown to $6.2 billion from $2.6 billion at the time of the sale of CATCo to Markel.

**B.     The Inquiry.**

28.     As with other companies in the same market, Markel CATCo annually established loss reserves following catastrophic insured loss events through a complex proprietary process involving actuarial modeling and computations.  In 2017, Markel CATCo, like other funds in the same market, experienced so-called loss creep in its reserves due to several unpredictable natural catastrophes, including without necessary limitation Hurricanes Harvey, Irma, Maria, and the unprecedented 2017 wildfires in California.  These natural disasters required Markel CATCo, and others, to modify their loss reserves in late 2017 and throughout 2018. Markel CATCo recalculated the necessary loss reserve, and obtained approval of the new loss reserve from Markel CATCo's auditors, KPMG. In addition, the loss reserves were presented to Markel Co-Chief Executive Officer Richard R. Whitt III and to the board of directors of both the private and public funds managed by Markel CATCo, and all agreed that the loss reserve methodology was sound and that the loss reserves were sufficient based on the industry loss knowledge available at that time.

29.     On information and belief, on or about November 30, 2018, Markel was contacted by U.S. and Bermuda authorities with inquiries regarding loss reserves recorded in late 2017 and early 2018 at Markel CATCo (collectively,  the "Inquiry").  No separate outreach was made to Markel CATCo, a Bermuda entity.  Markel shared information only sparingly with Plaintiff and with Markel CATCo's officers and directors.  Markel did not initially inform Plaintiff, Mr. Belisle, or others at Markel CATCo of the Inquiry.  Instead, on or about December 4, 2018,

without notice to Markel CATCo, Markel General Counsel Richard Grinnan traveled to Bermuda along with attorneys Christopher Gunther and David Zornow from Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), whom Markel retained to conduct an internal review at Markel CATCo.  Markel also brought along one or more employees of IT vendor Consilio to image personal and business devices in the possession of the Markel CATCo employees.  On the afternoon of December 4, 2018, without any meaningful advance notice, the representatives from Skadden and Markel arrived at Markel CATCo, demanded to meet with the entire staff, and immediately began what they described as an "internal review."

30.     The Markel and Skadden representatives, without disclosing that they would be imaging personal communications and communication modes, e.g., WhatsApp, and without suggesting that the employees had a choice, demanded that all employees, including Plaintiff, surrender their personal phones and other business and personal electronic devices, to be imaged and/or searched immediately.  Based on these demands and under the misinformed belief that they had no choice in the matter, Plaintiff and Mr. Belisle (among others) provided their personal smartphones and other personal and company-owned devices to Consilio for imaging, believing that the imaging on the personal cell phones would be limited to company accounts and would not be extended to personal communications, e.g., via text or WhatsApp.

31.     Despite the fact that no public announcement was required, Markel indicated its intention to announce publicly that Markel CATCo was under investigation by an unidentified department of the United States Government.  Markel CATCo's Management as well as the Boards of the public and private funds managed by Markel CATCo voiced the view that no public announcement was required or should be made, particularly given that such an announcement would be against the interests of the investors in the two funds managed by

Markel CATCo.  Markel ignored those entreaties and issued a press release on December 6, 2018, gratuitously disclosing the existence of the Inquiry, and stressing that the Inquiry did not "involve other Markel Corporation companies," and stating that "outside counsel has been retained to conduct an internal review."  Markel's issuance of the press release was thus over the objections of Markel CATCo Management and the Directors of the two funds managed by CATCo.

32.     In the first trading day following the December 6 announcement Markel's stock price dropped nearly 9%, representing a loss of more than $1 billion of market capitalization; and shareholder lawsuits were filed against Markel.  Further, Markel CATCo's publicly traded fund was severely impacted with the ordinary share price dropping nearly 40% in one day.

33.     Plaintiff fully cooperated with the internal review and participated in interviews with Skadden lawyers as and when requested, but neither Plaintiff nor Mr. Belisle was permitted to participate in the Inquiry itself.  Despite Plaintiff's crucial role with Markel CATCo, Markel did not provide her – and indeed, to this day still has not provided her – with more than cursory information about the scope, progress or status of the Inquiry.

34.     Markel's unwillingness to involve either Plaintiff or Mr. Belisle in the Inquiry was short sighted and contrary to the best interests of Markel CATCo, the investors in the funds managed by Markel CATCo, and the Markel CATCo employees and management team, including Plaintiff.  Nevertheless, Markel discouraged the efforts of Plaintiff and Mr. Belisle to participate in the Inquiry, even on their own behalf.

35.     Even without more detailed information regarding the precise scope of the Inquiry, Plaintiff is confident that there was no wrongdoing with respect to Markel CATCo's loss calculations.  The estimation of loss reserves is, however, an extremely complicated and

specialized area.  In light of this fact, both Plaintiff and Mr. Belisle have been anxious to provide as much information as possible so that Skadden and the government agency understand the process and the actions that Markel CATCo took in making loss estimations and reports.  Among other things, Plaintiff and Mr. Belisle have offered to speak to the government agency regarding these issues.  Markel has never accepted that proposal.

### C.    *Markel Promises to Pay Incentive Payments.*

36.    With Markel's own stock price falling nearly 9% the day after the announcement, representing a loss of more than $1 billion in market capitalization, and continuing to fall by nearly 17% throughout December 2018, Markel's executives, including Co-Chief Executive Officer Richard Whitt and General Counsel and Chairman of Markel Corp.'s Board Richard Grinnan, requested that Mr. Belisle delay or forfeit the incentive CSE and PE compensation payments that were scheduled to vest on December 31, 2018.

37.    However, on December 13, 2018, during a telephone call among Messrs. Belisle, Whitt, and Grinnan, among others, Mr. Whitt stated that that all other Markel CATCo employees, including Plaintiff, would "definitely" receive their incentive payments.  Whitt then confirmed that Mr. Belisle could communicate confirmation of the incentive payments to the entire staff, including Plaintiff, immediately following this telephone call, which he did.

38.    On December 31, 2018, Plaintiff was fully vested in her 2018 CSB of $125,000, would at subsequent year-ends be entitled to an additional $325,000 in CSB payments, and would on March 31, 2019 be entitled to a $7,000,000 Retention Bonus.  The $325,000 and $7,000,000 payments vested immediately in the event of a termination without cause.  All were forfeited in the event of a termination for cause.

39.     Defendants did not have cause to terminate Plaintiff or Mr. Belisle, so, they developed a scheme to do so.

40.     By means of an unauthorized and unlawful invasion of Plaintiff's privacy, Markel found its purported justification for depriving Plaintiff of millions of dollars that would shortly be due and owing to her:  On or shortly after December 4, 2018, Markel, with the assistance of vendors, accessed and then reviewed personal and private communications on electronic devices that they had demanded Plaintiff and Mr. Belisle provide for imaging, purportedly for use in the Inquiry.  This review occurred despite the fact that Defendants did not have permission from Plaintiff or Mr. Belisle to conduct a review of their personal, non-company accounts on their personal devices.

41.     Markel's deceptive actions undertaken in an attempt to avoid its obligations to Plaintiff did not end there.  Representatives of Markel began asking probing questions about portfolio strategy and how the business operates.  On information and belief, these actions were part of the coordinated scheme to remove Plaintiff and Mr. Belisle from their positions and avoid making the incentive payments, while, at the same time, providing Markel with information about the portfolio strategy and how the Markel CATCo business operates in order to run the company after Plaintiff and Mr. Belisle were no longer employed.

42.     On January 13, 2019, Markel Corp's Human Resources department informed all Markel CATCo employees, including Plaintiff and Mr. Belisle, that they would receive their respective incentive payments on January 30, 2019.  As explained below and herein, however, no such payment has been made to Plaintiff or to Mr. Belisle.

D.      *The Skadden "Interview."*

43.     On or about January 15, 2019, attorneys from Skadden contacted Plaintiff to schedule an interview.  Skadden disingenuously described the interview as a "follow-up" to earlier interviews between Skadden and Plaintiff concerning the Inquiry.

44.     Skadden scheduled an interview with Mr. Belisle for earlier on the same day of Plaintiff's interview.  Mr. Belisle was also disingenuously informed by Skadden that the "interview" would be a "follow-up" to earlier interviews in which he participated, arising from the Inquiry.

45.     The "interviews" occurred on January 17, 2018.  Although each interview began with an initial, fairly high-level discussion regarding loss reserves, Plaintiff quickly realized that the meetings were not scheduled for the purpose of learning information about that topic. Instead, Skadden informed Plaintiff that Markel or others on its behalf had accessed her personal communications without her knowledge or authorization. Based on communications they had improperly accessed, Skadden accused Plaintiff of engaging in an undisclosed personal relationship with Mr. Belisle.  Skadden claimed that the existence of the relationship was a violation of Markel's Code of Conduct and Plaintiff's employment agreements, although no such prohibitions existed in the agreements, in the Code as it existed on December 31, 2018, or in any Code as applied to a subordinate employee involved in a personal relationship with her superior.

46.     Markel and Skadden demanded that Plaintiff and Mr. Belisle surrender their phones and other electronic devices a second time, to be imaged again.  Plaintiff and Mr. Belisle were again told, incorrectly, that even if a device was personal – such as a personal smartphone that the employees had purchased with their own money – they were required to provide it to be imaged.  Based on these demands and under the continued, misinformed belief that they had no

choice and no right to privacy in their personal accounts, Plaintiff and Mr. Belisle again provided their personal smartphones and other devices to Consilio for imaging.

### E.   *Markel's Code of Conduct.*

47.   Prior to January 1, 2019, Markel's Code of Conduct did not contain a provision prohibiting or discussing personal relationships between Markel employees.  *See* Ex. 2 (the "Pre-2019 Code of Conduct").  Although the Code of Conduct had a section regarding "Conflicts of Interest," the text and examples made it clear that Markel's Pre-2019 Code of Conduct related to business relationships that could give rise to business conflicts of interest.

48.   At some time on or about December 4, 2018, after imaging Plaintiff's and Mr. Belisle's personal cell phones, including their personal accounts on those phones, Defendants became aware that Plaintiff and Mr. Belisle had developed a personal relationship.  Thereafter, Markel, without notice to Markel CATCo Management including Plaintiff, purported to amend its own Code of Conduct, to which Markel subsidiaries were subject, to state:  "Having a relationship with another Employee in the Company when one Employee directly or indirectly supervises the other Employee" is a potential or actual "Conflict of Interest."  *See* Ex. 3 (the "Substitute Code of Conduct").  The Substitute Code of Conduct bears the date January 2019 and appears to have been first posted online on January 7, 2019.  Plaintiff and Mr. Belisle were never given the opportunity to review or sign the Substitute Code of Conduct, nor were they even aware of its existence before their termination, even though they were both officers and directors of Markel CATCo.  The provision regarding personal relationships did not exist in prior versions of the Code of Conduct, which Plaintiff and Mr. Belisle did sign.  The provision in the Substitute Code of Conduct cannot be read in any event as justifying termination of the subordinate employee in the relationship.

49.     At no time did any relationship between Plaintiff and Mr. Belisle result in an improper conflict of interest, or create a situation that in any way interfered with or influenced Plaintiff's contribution to Markel or Markel CATCo, or impeded her ability to perform her work objectively and effectively.  To the contrary, the promotions of Plaintiff discussed above were all in process before any personal relationship began, and Plaintiff's Incentive Payments were not from Markel CATCo funds but were, rather, granted by Mr. Belisle through the Belisle Allocations.  In other words, as he customarily did with his key team members, he reduced his own payment by causing a well-earned portion to be due to Plaintiff.

50.     In addition, at the time of Plaintiff's promotion to CEO - Bermuda, her salary was increased commensurate with her new position as, prior to that time, her salary was significantly less than that of many of her direct reports.  At all times, any changes in salary for Plaintiff were approved by Mr. Whitt and Human Resources ("HR") at Markel.  Further, Plaintiff's most recent salary change was subject to a review of comparable roles at peer companies and was ultimately approved by both Mr. Whitt and Markel's HR and Compensation departments.  As such, Plaintiff's salary changes, as confirmed by Markel's Compensation team via an independent review, were fair and appropriate for the significant leadership role she had assumed at Markel CATCo.

**F.     *Plaintiff's Termination.***

51.     On January 18, 2019, through corporate maneuvering that was not shared with Plaintiff or Mr. Belisle (despite the fact that they were both directors of Markel CATCo), Markel elected five new, additional members to the Markel CATCo board, whose terms were to commence immediately.  All of the new members were under the control of Markel.  Markel

CATCo then convened a meeting of the Board of Directors, five of whom were directly controlled by Markel and four of whom, including Plaintiff and Mr. Belisle, were not.

52.     Plaintiff and Mr. Belisle were informed during the purported Board meeting that they were terminated, effective immediately, and that their respective incentive payments would not be paid.  The two actual Markel CATCo Board members apart from Plaintiff and Mr. Belisle declined to vote, and the terminations were carried out by the newly appointed Markel-sponsored "directors."

53.     Mr. Belisle offered to "cure" any perceived conflict of interest (although no such conflict existed) by resigning immediately, while Plaintiff continued as Chief Executive Officer of Markel CATCo.  Mr. Belisle was entitled to a notice and a cure period, neither of which Markel allowed; and his proposed actions would in fact have cured any conflict of interest, although none existed.   He expressed concerns to the newly constituted Board that, given the crucial roles that he and Plaintiff played, Markel CATCo could be rendered unable to survive, and its investors in the funds that it managed harmed, if he and Plaintiff were both terminated. The newly constituted Board ignored the entreaty, and continued to deny Mr. Belisle his contractual opportunity to cure the purported grounds for termination.

54.     On January 18, 2019, Plaintiff received a Notice of Termination of Employment from Mr. Grinnan, which specified that Plaintiff had been terminated for "Cause, as defined in [her] employment agreement."   The notice includes the baseless claim that Plaintiff "breached the Employment Agreement prior to December 31, 2018 and [was] not in good standing with [Markel CATCo] as of that date."  Therefore, Mr. Grinnan concludes, Plaintiff was ineligible for, and would not receive, any Incentive Payments – despite the fact that some of the payments had already vested before the termination and others were due and owing, or would be shortly,

because no "cause" existed justifying her termination.  The notice ignores the fact that, as the subordinate in the relationship, Plaintiffs' conduct could not have been a terminable offense even under the hastily revised January 2019 Substitute Code of Conduct.

55.     Markel provided a similar message to Mr. Belisle, and refused to pay him any of his $65,950,000 in incentive payments, even though they were fully vested and payable.

56.     Later that same day, Markel issued a press release in which it falsely stated that Plaintiff had violated Markel policies as a result of her relationship with Mr. Belisle.  The press release further implied -- falsely -- that Plaintiff's termination was also somehow related to the Inquiry.

57.     On information and belief, on or about January 29, 2019 Markel CATCo convened a call with over 100 attendees, including investors and staff in the managed funds.  The President and Chief Underwriting Officer of Markel Global Reinsurance, Jed Rhoads, who was appointed as the  interim head of Markel CATCo, began the call by stating that no questions would be taken and that the purpose was to address why Plaintiff's and Mr. Belisle's employment had been terminated.  Markel representatives went on to say that during the Inquiry, Markel uncovered the fact that Plaintiff and Mr. Belisle had engaged in an undisclosed personal relationship, including during a period when Mr. Belisle was setting Plaintiffs' salary and bonuses.   No mention was made that the salaries and bonuses were approved by Markel, or that the bonuses and other Incentive Payments were from the Belisle Allocations, not from funds of Markel or Markel CATCo.  Further, the bonuses were fully in line with Plaintiff's position as Markel CATCo CEO-Bermuda, the highest position behind Mr. Belisle's own and one for which Plaintiff was selected before any personal relationship existed.

58.     These statements and others that Markel and its agents have made are false and misleading, and portray a supposed conflict of interest that did not occur and a violation of a corporate policy that did not exist and would not in any event have applied to a subordinate employee.

59.     Defendants' conduct was wanton, malicious, motivated by ill will and hostility and calculated to lead to a financial gain of tens of millions of dollars.  Defendants developed a concerted plan, after invading Plaintiff's privacy, to surreptitiously alter Markel's Code of Conduct as a pretextual basis to terminate Plaintiff's employment without notice or opportunity to cure, thereby denying her substantial benefits under the Addendum.  Moreover, Defendants then proceeded to invade her privacy further by publicly announcing the occurrence of a private personal relationship, falsely stating that the relationship constituted a conflict of interest in violation of a policy that did not exist and would not have applied, and falsely implying that the termination was also related to the Inquiry.  All of this conduct was undertaken in an apparent attempt to cover up the actual monetary reason for Plaintiff's and Mr. Belisle's termination, and with the apparent goal of clouding her reputation to prevent or materially impair her ability to compete with Markel CATCo or Markel after her termination

## COUNT I
## BREACH OF CONTRACT (MARKEL AND MARKEL CATCo)

60.     Plaintiff incorporates by reference Paragraphs 1 through 59 as if set forth fully herein.

61.     On or about October 19, 2018, Plaintiff and Markel CATCo entered into the Addendum, which superseded Schedule 2 to her employment agreement in its entirety and governed the parties' obligations with respect to the subjects covered by the Addendum, including Incentive Payments.

62.    Plaintiff performed her obligations to Markel CATCo in every material respect, up through and including January 18, 2019.

63.    Pursuant to the Addendum, Plaintiff's 2018 CSB vested on December 31, 2018, and Markel CATCo was obligated to pay it on or before January 30, 2019.

64.    Pursuant to the Addendum, when Markel CATCo terminated Plaintiff without cause, Markel CATCo became obligated to pay the full RB and any remaining CSB within thirty days of termination.  Addendum at 3.  It failed to do so.

65.    Plaintiff was terminated without cause and without notice on January 18, 2019.

66.    Markel CATCo has not remitted the 2018 CSB to Plaintiff and has repudiated its obligations to pay it and the remaining Incentive Payments, thereby breaching the Addendum and causing resulting harm to Plaintiff.

67.    Markel assumed control of the Markel CATCo Board of Directors in January 2019 in order to terminate Plaintiff's and Mr. Belisle's employment.

68.    By its unilateral exercise of control of its wholly owned subsidiary, and the other actions described above, Markel demonstrated that it is Markel CATCo's alter ego.

69.    Markel, through its alter ego Markel CATCo, materially breached Plaintiff's Addendum (a) by causing Markel CATCo to repudiate its obligation to pay Plaintiff's Incentive Payments under the Addendum, and (b) by terminating Plaintiff's employment without cause.

70.    Alternatively, Markel's control of Markel CATCo created an agency relationship whereby Markel CATCo's acts as an agent are attributable to Markel as the principal.

71.    Markel CATCo acted as Markel's agent with respect to Markel CATCo's breaches of the Addendum, and Markel is liable for those breaches as Markel CATCo's principal.

72.     In sum, Markel is liable along with Markel CATCo for the breach of Plaintiff's rights pursuant to the Addendum, either because Markel CATCo made itself the alter ego of Markel CATCo or because Markel was the principal on whose behalf its agent Markel CATCo acted.

## COUNT II
## BREACH OF THE IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING (MARKEL AND MARKEL CATCo)

73.     Plaintiff incorporates by reference Paragraphs 1 through 72 as if set forth fully herein.

74.     In every agreement, including the Addendum, there is an implied covenant that the parties will act in good faith and fairly with another.  Contracting parties are prohibited from behaving in a manner inconsistent with the parties' common purpose and justified expectations.

75.     If, for any reason, Markel or Markel CATCo is found not to have breached the Addendum, either or both nonetheless breached the covenants of good faith and fair dealing.

76.     Markel, acting through its agent Skadden, violated Plaintiff's privacy by informing her that she was required to turn over her personal cell phone for imaging, while causing her to believe that only company accounts would be imaged.  Without notice or authorization, Markel, acting through its agent Skadden, caused Plaintiff's personal accounts on her personal cell phone to be imaged.  Markel and Markel CATCo then used that improperly obtained personal data as a pretextual basis to terminate Plaintiff's employment with Markel CATCo.

77.     In addition, Markel replaced the Pre-2019 Code of Conduct with the Substitute Code of Conduct to include personal relationships as conflicts of interest, without notice to or action by, the Markel CATCo directors or officers.

78.     Markel and Markel CATCo then terminated Plaintiff's employment and denied her Incentive Payments that had already vested on December 31, 2018 and that would vest or become payable soon, on the basis that she had violated the Substitute Code of Conduct, about which she knew nothing and which would not have applied to her as the subordinate employee in any event.

79.      Further, Markel and Markel CATCo announced publicly (a) that Plaintiff's employment was being terminated for engaging in a personal relationship, thereby further violating her privacy rights; (b) that the relationship violated company policy, when the policy had only been modified after January 1, 2019 and would not have applied to her as the subordinate employee in any event ; and (c) that the Inquiry was occurring simultaneously with the termination, thereby falsely implying a relationship between the termination and the Inquiry.

80.     Markel's and Markel CATCo's conduct as alleged in the foregoing paragraphs, individually and collectively, violates the implied covenant of good faith and fair dealing.

81.     Markel and Markel CATCo's breach of the implied covenant of good faith and fair dealing has caused, and continues to cause, injury to Plaintiff, including but not limited to, failure to pay the Incentive Payments which she is due under the Addendum, injury to reputation, and distress and embarrassment attendant upon the invasion of her privacy rights

**COUNT III**
**UNJUST ENRICHMENT (MARKEL AND MARKEL CATCo)**

82.     Plaintiff incorporates by reference Paragraphs 1 through 81 as if set forth fully herein.

83.     Markel CATCo is a wholly owned subsidiary of Markel, such that Markel benefits financially through Markel CATCo as a result of Plaintiff's activities.  For example, in

conjunction with Mr. Belisle, Plaintiff raised $2.3 billion in the Fall of 2017 for Markel CATCo's private and public finds.

84.     Markel, as the owner of Markel CATCo, realized substantial benefits from Plaintiff's performance from March 2016 through January, 2019, reflected in the annual revenue of Markel CATCo during that period.

85.     Markel, either itself or through its subsidiary and alter ego Markel CATCo, has retained for its own benefit the Incentive Payments due to Plaintiff.

86.     In light of Markel's misconduct culminating in the termination of Plaintiff, it is unconscionable for Markel to retain the benefit of Plaintiff's services and to withhold the Incentive Payments from Plaintiff.   Alternatively, it is unconscionable for Markel to passively accept through Markel CATCo the benefits of Plaintiff's services and to retain Plaintiff's Incentive Payments.

87.     Markel and Markel CATCo have been unjustly enriched at the expense of Plaintiff by their wrongful conduct.

## COUNT IV
## DEFAMATION (MARKEL AND MARKEL CATCo)

88.     Plaintiff incorporates by reference Paragraphs 1 through 87 as if set forth fully herein.

89.     On January 18, 2019, Markel issued a press release stating that Plaintiff and Mr. Belisle violated "Markel policies relating to an undisclosed personal relationship," and were "no longer with the company" following "prompt action . . . taken" by Markel.  The January 18, 2019 press release sandwiched these statements regarding Plaintiff and Mr. Belisle's termination, which constitute an invasion of privacy as discussed below, with references to the Inquiry, even though the personal relationship is entirely unrelated to the Inquiry.

90.     Markel     published     the     press     release     on     its     website     at
http://www.markelcorp.com/About-Markel/NewsRoom/Reuters2383940; issued the press release
to PRNewsire, Reuters, and an unknown number of other media organizations for further public
dissemination; and filed the press release with the Securities and Exchange Commission's
EDGAR system on an 8-K Form.

91.     On information and belief, Markel and others acting at its behest (including new
officers of Markel CATCo) have likewise made oral statements to third parties, including
investors, that Plaintiff and Mr. Belisle were terminated because they breached their respective
employment agreements, engaged in actions that subjected them to a conflict of interest, and
violated Markel's code of conduct.   These oral statement have occurred, among other times,
during a call with investors on or about January 29, 2019.

92.     Defendants' press release and oral statements regarding Plaintiff's termination
were false and defamatory, because Plaintiff did not violate any Markel policy in existence prior
to January 1, 2019 and did not engage in actions that gave rise to a conflict of interest, and
because the Substitute Code of Conduct would not have applied to her as the subordinate
employee in any event.

93.     Defendants' press release and oral statements were also false and defamatory by
omission, inasmuch as they state that Plaintiff and Mr. Belisle violated Markel's policies, while
omitting that:

a.  With knowledge of Plaintiff and Mr. Belisle's relationship, Markel
created, but did not give prior notice of or obtain approval from the
Markel CATCo Board of, the Substitute Code of Conduct, which had
purportedly been modified to require disclosure of personal relationships;

   b. Plaintiff as the subordinate employee would not be subject to termination under the Substitute Code of Conduct in any event;

   a. Markel did not notify either Plaintiff or Mr. Belisle that it had created the Substitute Code of Conduct to prohibit undisclosed relationships, notwithstanding that Markel knew of their relationship; and

   b. Plaintiff and Mr. Belisle's relationship was not in violation of Markel's Code of Conduct, certainly as it existed prior to January 2019, because the Substitute Code of Conduct was never properly adopted, nor was it accepted by Plaintiff or Mr. Belisle.

94.    Defendants' statements were also false and/or false by omission to the extent that they state that Plaintiff's and Mr. Belisle's employment was terminated in the course of Markel's internal review related to the Inquiry, thereby implying a connection between the termination and the Inquiry while omitting the fact that the relationship and the termination were entirely unrelated to the Inquiry.

95.    Each of Defendants' misrepresentations and misleading statements, and all of them collectively, have held Plaintiff up to scorn, ridicule, disgrace or contempt in the mind of a considerable and respectable segment of the community, and have damaged her reputation and business opportunities.

96.    At the time the statements were made, Defendants knew, or at the very least should have known, that the statements were false and/or that they had omitted material additional information rendering the statements misleading.

97.    Defendants' statements have caused, and continue to cause, injury to Plaintiff's personal and business reputations, the full extent of which is not yet known to Plaintiff.

## COUNT V
## INVASION OF PRIVACY (MARKEL AND MARKEL CATCo)

98.     Plaintiff incorporates by reference Paragraphs 1 through 97 as if set forth fully

herein.

### A.     Intrusion Upon Seclusion and Solitude

99.     On or about December 4, 2018, Markel and Skadden demanded that Plaintiff

surrender her phone and other electronic devices to be imaged and/or searched.  Markel and

Skadden falsely represented that even if a device was personal, Plaintiff was required to provide

it for imaging, and led Plaintiff to believe that the imaging would be limited to corporate

accounts on the devices.

100.     Based on these demands, Plaintiff provided her personal smartphone and other

personal and company-owned devices to Markel's agents.  Plaintiff did not authorize the imaging

or review of her personal, non-corporate accounts.

101.     On or about January 17, 2019, Markel and Skadden again demanded that Plaintiff

make her personal smartphone available to Markel's agents for copying.  Again, based on the

demand and disingenuous representations, Plaintiff provided her phone but did not authorize the

imaging or review of her personal, non-corporate accounts.

102.     Plaintiff's smartphone includes extensive electronic data related to Plaintiff's

private life that is entirely unrelated to either the Inquiry or Plaintiffs' employment at Markel

CATCo, and that she neither understood would be, nor authorized to be, imaged or reviewed.

103.     As a result of the prior imaging if not otherwise, Markel CATCo, and their agents

knew that Plaintiff's smartphone contained extensive information concerning Plaintiff's private

life that was entirely unrelated to either the Inquiry or Plaintiff's employment at Markel CATCo.

104.    Defendants Markel CATCo, and Markel acting as alter ego to Markel CATCo, further invaded Plaintiff's privacy by unnecessarily and maliciously announcing that Plaintiff had been terminated because of a personal relationship that purportedly violated a Company policy that did not exist at any relevant time and would not have applied to Plaintiff as the subordinate employee in any event.

105.    Plaintiff has been harmed by Defendants' intrusion upon her solitude and seclusion, both because her personal information was accessed without authorization and used as an unlawful basis to terminate her employment, and because her personal information was unnecessarily announced in a manner designed to embarrass and interfere with her relationships.

**B.    Public Disclosure of Private Facts**

106.    On information and belief, Defendants discovered Plaintiff's personal relationship with Mr. Belisle through unauthorized review of Plaintiff's personal correspondence and documents.

107.    Plaintiff's personal relationship with Mr. Belisle was private and is of no legitimate concern to the public.

108.    Defendants publicized Plaintiff's private personal relationship to the public at large through, among other means, issuing a press release, filing a form 8-K with the Securities and Exchange Commission, and making oral statements to Markel CATCo investors and employees.

109.    Plaintiff did not authorize or consent to Defendants' communication of her private personal relationship to the public at large.

110.    Plaintiff has been harmed by Defendants' public disclosure of private facts concerning Plaintiff, both because her private information was used as an unlawful basis to

terminate her employment, and because it was publicly announced in a manner designed to embarrass and interfere with her family relationships.

### C.      False Light

111.    Defendants' press release and oral statements regarding Plaintiff's termination were false and defamatory, and/or false and defamatory by omission, as set forth above.

112.    At the time they were made, Defendants knew that the statements were false and/or that they had omitted additional information, which omissions caused the statements to be misleading.   Defendants acted intentionally and maliciously.   Or, at a minimum, Defendants recklessly disregarded whether these statements were false.

113.    Defendants publicized these misrepresentations and misleading statements to the public at large through, among other means, issuing a press release, filing an 8-K, and making oral statements to Markel CATCo investors and employees.

114.    Plaintiff has been harmed by Defendants' conduct in publicly placing her in false light.

115.    Defendants' invasions of Plaintiffs' privacy through intrusion upon seclusion, unauthorized accessing and use of private facts, unnecessary public disclosure of private facts, and publicly placing Plaintiff in a false light have caused, and continue to cause, injury to Plaintiff's personal and business reputations, the full extent of which is not yet known to Plaintiff.

## <u>PRAYERS FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that judgment be entered in her favor as follows:

a.      Awarding contractual damages to Plaintiff in the amount of the Incentive

Payments, and such other consequential damages as are appropriate for violation of the

Addendum;

b.      Awarding compensation and damages to Plaintiff for harm caused by Defendants'

tortious actions, including without limitation damages for emotional distress and injury to

reputation;

c.      Awarding pre-judgment, post-judgment, and statutory interest;

d.      Awarding attorneys' fees and costs;

e.      Ordering such other and further legal relief as the Court may deem just and

proper.

## JURY TRIAL DEMAND

Plaintiff demands trial by jury of all claims so triable.

Respectfully submitted

ALISSA FREDRICKS,

By her attorneys,


/s/ Joan A. Lukey
Joan A. Lukey
joan.lukey@choate.com
Justin J. Wolosz
jwolosz@choate.com
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
Tel.: (617) 248-5000
Fax: (617) 248-4000

Date: February 21, 2019