# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                        )
ALISSA FREDRICKS,          )
                        )
          Plaintiff,     )
                        )
v.                        )   Civil Action No. 1:19-cv-10331 (RGS)
                        )
MARKEL CATCO INVESTMENT    )
MANAGEMENT LTD AND MARKEL   )
CORP.,                    )
                        )
          Defendant.   )
_____)

## FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Alissa Fredricks ("Plaintiff") brings this First Amended Complaint against Markel CATCo Investment Management Ltd ("Markel CATCo") and Markel Corp. ("Markel" or, collectively with Markel CATCo, "Defendants").

## OVERVIEW

1.     This action arises from the improper and unlawful actions of Markel and its wholly owned subsidiary Markel CATCo, as well as others acting at Markel's behest, through which Defendants have refused to make incentive payments to Plaintiff in the amount of $7,450,000, all of which became due and owing upon the occasion of the termination of her employment without cause. The action further arises from efforts undertaken by Defendants to tarnish Plaintiffs' reputation in order to prevent her from competing with Defendants in the future. Defendants have used unlawful, unfair and deceptive means to achieve these ends. Such conduct has included without limitation wrongfully terminating Plaintiff's employment without

cause on pretextual grounds; attempting to justify the wrongful termination by amending a corporate policy after the fact to make previous conduct improper; invading her privacy by accessing highly personal information without authorization, and then using such highly personal information to cause public embarrassment, injury to reputation, and emotional distress; implying in a public announcement that the termination somehow related to an on-going Government inquiry of Markel CATCo, when in fact the events were unrelated; and, conducting all such activities, maliciously, intentionally, with reckless disregard for the truth, and/or negligently, thereby causing irreparable and foreseeable harm to Plaintiff and her good reputation.

2.     Markel has also failed to comply with its obligations under Markel CATCo's bye-laws to indemnify and hold harmless Plaintiff in her capacity as a former director of Markel CATCo with respect to the same Government inquiry, causing additional, ongoing harm to Plaintiff.

3.     In May 2016, Markel CATCo hired Plaintiff to work as a Senior Actuary in its office in Wellesley, Massachusetts.  Plaintiff's principal residence was then, and is now, in Massachusetts, although a period of her work for Markel CATCo was in Bermuda.  Plaintiff is skilled in astrophysics, actuarial science and catastrophe risk modeling, and it quickly became clear to many at Markel CATCo and Markel that she had the potential for significant promotions to leadership positions, including as successor to Markel CATCo's then Chief Executive Officer Anthony Belisle ("Mr. Belisle").  Plaintiff signed various employment-related agreements over time, the last of which was the "Addendum to Employment Agreement" executed on October 19,

2018, Attached to Complaint as Ex. 1 (ECF No. 1-1, the "Addendum").[1] The Addendum replaced the previous "Schedule 2 Incentive Compensation," and governs Plaintiff's incentive compensation structure, which included, among other elements, a Continued Service Bonus ("CSB") and a Retention Bonus ("RB") (collectively, the "Incentive Payments").

4.      The CSB was in the total aggregate amount of $450,000 to be earned in three non-equal segments if Plaintiff remained actively and continuously employed in good standing on December 31 of 2018, 2019, and 2020.   In the event that her employment was terminated without cause before December 31, 2020, she was contractually entitled to receive any unpaid portion of the CSB within thirty days of the termination date.

5.      The RB, in the gross amount of $7,000,000 was to be paid in full on March 31, 2019, with vesting on a prorated monthly basis, and final vesting on March 31, 2021.   In the event that Plaintiff's employment was terminated without cause, she was contractually entitled to full vesting and to retention of the full bonus with no claw-back rights on the part of Defendants.

6.      The funds for the CSB came, not from Defendants, but from funds allocated by Mr. Belisle from his own incentive payments from Markel CATCo.   Each year, Mr. Belisle determined the recipients and the amount to be allocated to key employees, obtained Markel's sign-off, and provided a spreadsheet of approved payments to Markel CATCo for distribution (the "Belisle Allocations").   The last of his incentive payments, in the amount of $65,950,000 after earmarking the Belisle Allocations, vested on December 31, 2018 and was to be paid by January 30, 2019.

---

[1] Exhibits 1-3 referenced herein were attached to the initial Complaint in this case (ECF No. 1). Pursuant to CM/ECF Administrative Procedure O(3), Plaintiff is not attaching them a second time with this Amended Complaint and refers to them by ECF Number.

7.     The funds for Plaintiff's RB also came, not from Defendants, but from the Belisle Allocations.  The $7,000,000 RB was in recognition of her role as Mr. Belisle's presumed successor.

8.     Thus, Mr. Belisle provided the funds from his own guaranteed incentive payments for Plaintiffs' Incentive Payments in the amount of $7,450,000.   Markel approved the allocations, and Markel CATCo contractually guaranteed the payments in the Addendum.

9.     As the January 30, 2019 deadline approached for Markel CATCo to make the last incentive payments to Mr. Belisle in the amount of $65,950,000, Markel used its ownership of Markel CATCo to contrive a scheme to cause Markel CATCo to terminate Plaintiff's and Mr. Belisle's employment, purportedly for cause, before January 30.  In this way, Markel and Markel CATCo avoided payment of Mr. Belisle's $65,950,000, and Plaintiff's vested $125,000 CSB payment.  In addition, Markel and Markel CATCo avoided Plaintiff's $7,000,000 RB due weeks later on March 31, 2019, and Plaintiff's remaining $325,000 CSB due over time, or immediately in the event of termination without cause.  Had Markel and Markel CATCo terminated only Mr. Belisle's employment, Markel CATCo would still have owed Plaintiff $7,450,000 in CSB and RB from the Belisle Allocations, pursuant to the Addendum.

10.     The scheme contrived by Markel to cause Markel CATCo to terminate Plaintiff's and Mr. Belisle's employment included the following:  On January 18, 2019, Markel unilaterally and without notice reconstituted the Markel CATCo Board with five of its own captive directors, thereby giving Markel instant control of the Board and the ability to terminate Plaintiff's and Mr. Belisle's employment.   All of Mr. Belisle's remaining incentive payments and a portion of Plaintiff's Incentive Payments had already vested on December 31, 2018.   All of Plaintiff's Incentive Payments were due and owing within thirty days of termination if Plaintiff were

terminated without cause. Defendants claimed that the terminations were "for cause," and were based upon an undisclosed personal relationship between Plaintiff and Mr. Belisle. Once the terminations were announced, Markel refused to satisfy, or to allow Markel CATCo to satisfy, the payment obligations to either Plaintiff or Mr. Belisle, including those that had already vested on December 31, 2018.

11.     In conjunction with the termination of Plaintiff's employment, in a manner that ensured that Plaintiff and Mr. Belisle would be critically impeded from competing with Markel CATCo in the future, Markel publicly announced the purportedly for-cause termination, disclosed the personal relationship as the grounds, and simultaneously falsely intimated that the terminations were somehow related to a Government inquiry of Markel CATCo (the "Government Inquiry") that had been in process since November 30, 2018 relating to loss reserves. The terminations in fact had nothing to do with the on-going Government Inquiry, as indicated in the termination letters and in Markel's statements to the Markel CATCo Board at the time of the termination..

12.     Plaintiff continues to suffer harm with respect to the same on-going Government Inquiry. Plaintiff was a director of Markel CATCo before her unlawful termination, and Markel CATCo's bye-laws explicitly require the company to indemnify and hold harmless directors and officers in connection with the duties they performed on behalf of the company. Plaintiff has retained counsel in connection with the Government Inquiry, but Markel CATCo has refused to respect the promises in its own bye-laws to reimburse Plaintiff for the expenses incurred.

13.     In addition, Markel, through its agent Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), has repeatedly refused to permit Plaintiff to participate with Markel and Markel CATCo in the Government Inquiry, despite the fact that she and Mr. Belisle are the two

people with greatest knowledge of the loss reserve process that is involved in that inquiry. Markel has further refused to permit Plaintiff to see any of the documents that it has turned over to the Government, including those to, from, or about Plaintiff, unless she agrees to a stay of this lawsuit pending all or some unspecified part of the Government Inquiry. Markel has thereby effectively prevented Plaintiff from speaking on her own behalf to the Government, which she cannot as a practical matter do without knowing the context in which her comments would be received.

14.     Defendants' assertion of total control over participation in the Government Inquiry has caused, and is causing, continued harm to Plaintiff's reputation, and has placed her in a state of limbo in terms of seeking new employment.

15.     Plaintiff now brings this action to enforce her rights under the Addendum and under Markel CATCo's bye-laws, and to recover for additional damages suffered as a result of Defendants' tortious conduct.

## **PARTIES**

16.     Plaintiff is a citizen of the United States whose principal residence is in Barnstable County, Massachusetts.

17.     Defendant Markel CATCo Investment Management Ltd. is a Bermuda exempted reinsurance investment company. Markel CATCo's principal place of business is in Hamilton, Bermuda, and it conducts business all over the world. Markel CATCo is a party to the Addendum.

18.     Defendant Markel Corporation is a corporation organized under the laws of the Commonwealth of Virginia. Markel's principal executive offices are located in Glen Allen, Virginia and it likewise conducts business all over the world, including in Massachusetts.

Markel is, and has been since the purchase of CATCo, the 100% owner of Markel CATCo. Before January of 2019, Markel allowed Markel CATCo to operate essentially autonomously, with its own Board of Directors and with control vested in the executive officers of Markel CATCo. However, on or about January 17 or 18, 2019 Markel assumed control of Markel CATCo by placing five captive Markel Directors on the Markel CATCo Board, creating an instant majority, in order to terminate Plaintiff's and Mr. Belisle's employment. Since at least that point in time, Markel has been an alter ego to, or the principal in a principal/agent relationship with, Markel CATCo.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants. Markel and Markel CATCo are citizens of a different state and a foreign state, respectively, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

20.     This Court has personal jurisdiction over Defendant Markel CATCo, at a minimum with respect to this Action, because:

    a. Markel CATCo solicited Plaintiff for employment in Massachusetts, negotiated employment contracts with Plaintiff in Massachusetts, and employed Plaintiff in Massachusetts from the beginning of her employment in May 2016 through March 2017 .

    b. Markel CATCo has published defamatory statements and private facts regarding Plaintiff to a global audience, causing harm to the personal reputation of Plaintiff, a Massachusetts resident, and to the business

reputation of Plaintiff with respect to her professional and personal acquaintances, especially including within her state of residence.

c. Markel CATCo has availed itself of the laws of Massachusetts by, among other things, regularly soliciting and doing business with institutional investors within Massachusetts. Plaintiff conducted business, on behalf of Markel CATCo and within the scope of her employment, with investors in Massachusetts.

21. This Court has personal jurisdiction over Defendant Markel because:

a. On information and belief, Defendant Markel underwrites specialty commercial insurance policies on a national basis, with regional sales personnel dedicated specifically to a region that includes Massachusetts residents. Markel's wholly owned subsidiary, Markel Service, Incorporated, is licensed with the Massachusetts Secretary of the Commonwealth to conduct business as a foreign for-profit corporation and is described as an insurance brokerage.

b. Markel has been the alter ego of its wholly owned subsidiary, Markel CATCo, at least since seizing control of the Markel CATCo Board for the purpose of terminating the employment of Markel CATCo's CEO, Mr. Belisle, and Markel CATCo's CEO-Bermuda and CEO-designate, Plaintiff.

c. Markel published defamatory statements regarding Plaintiff to a global audience, causing harm to the personal reputation of Plaintiff, a Massachusetts resident and to the business reputation of Plaintiff with

respect to her professional and personal acquaintances especially within her state of residence.

d. The personal cell phone from which Markel wrongfully caused Skadden to image personal, non-business accounts like WhatsApp, was purchased by Plaintiff in Massachusetts with her personal funds, and much of the set-up for the phone and use of the phone occurred while Plaintiff was resident in Massachusetts.

e. The communications between Markel and Plaintiff through their respective counsel, including with regard to her right to indemnification, and with regard to her ability to participate in the Government Inquiry, have occurred with Plaintiff and her counsel physically located in Massachusetts, and often with the involvement of Skadden Boston counsel also physically present in Massachusetts.

22.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2, 3), 1391(c)(3) because a substantial part of the events giving rise to the claim, including without limitation Skadden's communications with Plaintiff through her counsel regarding the Government Inquiry and her rights to indemnification occurred in this district, because Defendants Markel and Markel CATCo are subject to personal jurisdiction in this district with respect to this action, because Defendant Markel CATCo is a foreign entity not resident in the United States, and because Plaintiff is a United States citizen and Massachusetts resident whose contacts with Bermuda will completely end within a matter of days when her lease expires on March 31, 2019, her work permit having already expired on March 15, 2019.  In addition, the "Governing Law; Venue" provision in  the Addendum, while providing that the Addendum shall be governed by

Bermuda law, further provides only that the parties agree to submit to the jurisdiction of the Supreme Court of Bermuda. In contrast to exclusive forum-selection provisions in other contracts between Plaintiff and Markel CATCo, under which Plaintiff expressly does not sue, the parties did not agree to an exclusive forum. All other factors, including the wrongful conduct of a foreign entity against a U.S. citizen who resides in Massachusetts, favor venue here.

23.     Markel CATCo, with the knowledge and approval of Markel, agreed to an exclusive forum selection clause in New Hampshire in the employment contract of Mr. Belisle. Mr. Belisle's corresponding lawsuit is filed there, indicating that venue in the northeastern United States is not a burden upon Markel CATCo and Markel when contracting with one who has the bargaining power to insist upon it.

## STATEMENT OF FACTS

### A.     *Plaintiff's Employment.*

24.     Mr. Belisle conceived of, and participated in the establishment of, CATCo in July 2010, in conjunction with owner QIC, a Qatari entity. In each of the first six years of its existence, CATCo averaged double digit annual returns for its investors. On September 9, 2015, QIC completed the sale to Markel of substantially all of the assets of the two related companies that Mr. Belisle and QIC had founded – CATCo Investment Management Ltd. ("CATCo") and CATCo-Re Ltd. CATCo was an insurance-linked securities investment manager and reinsurance manager focused on building and managing highly diversified, collateralized retrocession and reinsurance portfolios covering global property catastrophe risks. CATCo-Re Ltd. was a provider of reinsurance protection.

25.     Markel sought to continue CATCo's business as a wholly owned subsidiary, which became Markel CATCo, with the existing management and in particular Mr. Belisle.

Following the asset purchase in September 2015, Markel announced in a press release that "[t]he existing CATCo management team, led by Chief Executive Officer Tony Belisle, will take on commensurate roles at Markel CATCo …" operating from Bermuda under Markel's ownership.

26.     As noted above, in May 2016, Markel CATCo hired Plaintiff as a Senior Actuary, working out of an office in Wellesley, Massachusetts.  Plaintiff, who is skilled in astrophysics, actuarial science and catastrophe risk modeling, among other things, quickly rose through the ranks at Markel CATCo.  As early as July 2016, Mr. Belisle first discussed with Plaintiff the possibility of moving to Bermuda to ultimately take over as the Bermuda Chief Executive Officer of Markel CATCo.  As early as December 2016, Mr. Belisle identified Plaintiff as his likely successor in an email to Markel's Co-Chief Executive Officer Richard Whitt III.  Such events substantially preceded the personal relationship referenced below.

27.     On December 21, 2016, Plaintiff negotiated and executed an agreement in Massachusetts to become the Chief Risk Officer of Markel CATCo.

28.     In March of 2017, Plaintiff rented a residence in Bermuda in connection with her role of Chief Risk Officer and worked from that office.

29.     Soon thereafter, the officers of Markel CATCo began discussions about Plaintiff ultimately assuming the role as Chief Executive Officer – Bermuda, and kept Markel apprised as a matter of courtesy.  In May 2017, Mr. Belisle emailed Markel co-CEO Richard Whitt stating his plan is to promote Plaintiff to the role of CEO-Bermuda within the next year.  This, too, preceded the personal relationship referenced below.

30.     Plaintiff became a director of Markel CATCo in or about the Spring of 2017 and was formally appointed as Chief Executive Officer – Bermuda in November 2017.  Plaintiff accepted her positions with knowledge of Markel CATCo's bye-laws, and with the

understanding that she would be entitled to be indemnified and held harmless pursuant to Markel CATCo's bye-law indemnification provision.

31. Plaintiff and Mr. Belisle consistently demonstrated the highest levels of success in performing their duties. This was largely due to the accomplishments of Plaintiff and Mr. Belisle, who travelled extensively worldwide to raise $2.3 billion of new capital in the Fall of 2017 and an additional $600 million during 2018, following a series of natural disasters that made such new capital critical to Markel CATCo's continued success. This has been quoted as one of the largest individual capital raises in the Insurance Linked Securities ("ILS") market history. Not only did Plaintiff and Mr. Belisle perform their jobs well, their capital-raising achievements were unprecedented in the history of their industry.

32. As of December 31, 2018, the combined assets under management ("AuM") of the funds managed by Markel CATCo had grown to $6.2 billion from $2.6 billion at the time of the sale of CATCo to Markel.

**B.    *The Government Inquiry.***

33. As with other companies in the same market, Markel CATCo annually established loss reserves following catastrophic insured loss events through a complex proprietary process involving actuarial modeling and computations. In 2017, Markel CATCo, like other funds in the same market, experienced so-called loss creep in its reserves due to several unpredictable natural catastrophes, including without necessary limitation Hurricanes Harvey, Irma, Maria, and the unprecedented 2017 wildfires in California. These natural disasters required Markel CATCo, and others, to modify their loss reserves in late 2017 and throughout 2018. Markel CATCo recalculated the necessary loss reserve, and obtained approval of the new loss reserve from Markel CATCo's auditors, KPMG. In addition, the loss reserves were presented to Markel Co-

Chief Executive Officer Richard R. Whitt III and to the boards of directors of both the private and public funds managed by Markel CATCo, and all agreed that the loss reserve methodology was sound and that the loss reserves were sufficient based on the industry loss knowledge available at that time.

34.     On information and belief, on or about November 30, 2018, Markel was contacted by U.S. and Bermuda authorities with inquiries regarding loss reserves recorded in late 2017 and early 2018 at Markel CATCo.  No separate outreach was made to Markel CATCo, a Bermuda entity.  In the several weeks following commencement of the Government Inquiry, Markel shared information only sparingly with Plaintiff and with Markel CATCo's other officers and directors.  Markel did not initially inform Plaintiff, Mr. Belisle, or others at Markel CATCo of the Government Inquiry.  Instead, on or about December 4, 2018, without notice to Markel CATCo, Markel General Counsel Richard Grinnan traveled to Bermuda along with Skadden attorneys Christopher Gunther and David Zornow, whom Markel retained to conduct an internal review at Markel CATCo.  Markel also brought along one or more employees of IT vendor Consilio to image personal and business devices in the possession of the Markel CATCo employees.  On the afternoon of December 4, 2018, without any meaningful advance notice, the representatives from Skadden and Markel arrived at Markel CATCo, demanded to meet with the entire staff, and immediately began what they described as an "internal review."

35.     The Markel and Skadden representatives, without disclosing that they would be imaging personal communications and communication modes, e.g., WhatsApp, and without suggesting that the employees had a choice, demanded that all employees, including Plaintiff, surrender their personal phones and other business and personal electronic devices, to be imaged and/or searched immediately.  Based on these demands and under the misinformed belief that

they had no choice in the matter, Plaintiff and Mr. Belisle (among others) provided their personal smartphones and other personal and company-owned devices to Consilio for imaging, believing that the imaging on the personal cell phones would be limited to company accounts and would not be extended to personal communications, e.g., via text or WhatsApp. In the case of Plaintiff, the cell phone at issue was one that she had purchased while living in Massachusetts, which had a phone number she initially obtained while a student in New Jersey, and continued to use while living in Massachusetts immediately before moving to Bermuda. Service on the phone was provided by Verizon Wireless.

36. Despite the fact that no public announcement was required, Markel indicated its intention to announce publicly that Markel CATCo was under investigation by an unidentified department of the United States Government. Markel CATCo's Management as well as the Boards of the public and private funds managed by Markel CATCo voiced the view that no public announcement was required or should be made, particularly given that such an announcement would be against the interests of the investors in the two funds managed by Markel CATCo. Markel ignored those entreaties and issued a press release on December 6, 2018, gratuitously disclosing the existence of the Government Inquiry, and stressing that the Government Inquiry did not "involve other Markel Corporation companies," and stating that "outside counsel has been retained to conduct an internal review." Markel's issuance of the press release was thus over the objections of Markel CATCo Management and the Directors of the two funds managed by CATCo.

37. In the first trading day following the December 6 announcement Markel's stock price dropped nearly 9%, representing a loss of more than $1 billion of market capitalization; and

shareholder lawsuits were filed against Markel. Further, Markel CATCo's publicly traded fund was severely impacted with the ordinary share price dropping nearly 40% in one day.

38. Plaintiff fully cooperated with the internal review and participated in interviews with Skadden lawyers as and when requested, but neither Plaintiff nor Mr. Belisle was permitted to participate in the Government Inquiry itself. Despite Plaintiff's crucial role with Markel CATCO, Markel did not provide her – and indeed, to this day has refused to provide her – with more than cursory information about the scope, progress or status of the Inquiry.

39. Markel's unwillingness to involve either Plaintiff or Mr. Belisle in the Government Inquiry was short sighted and contrary to the best interests of Markel CATCo, the investors in the funds managed by Markel CATCo, and the Markel CATCo employees and management team, including Plaintiff. Nevertheless, Markel discouraged the efforts of Plaintiff and Mr. Belisle to participate in the Government Inquiry, even on their own behalf. After the filing of this lawsuit, Markel indicated through counsel that they were free to do what they wished on their own behalf, but refused to provide them with, or identify, documents that Markel had provided to the Government agency, even with regard to documents or communications to, from or about them, unless they agreed to stay their lawsuits pending the outcome of the Government Inquiry. In addition, Markel took affirmative steps to ensure that they had no access to, and could not make use of, any such documents.

40. Even without more detailed information regarding the precise scope of the Government Inquiry, Plaintiff is confident that there was no wrongdoing with respect to Markel CATCo's loss calculations. The estimation of loss reserves is, however, an extremely complicated and specialized area. In light of this fact, both Plaintiff and Mr. Belisle have been anxious to provide as much information as possible so that Skadden and the government agency

understand the process and the actions that Markel CATCo took in making loss estimations and reports.  Among other things, Plaintiff and Mr. Belisle have offered to speak to the government agency regarding these issues.  Markel has never accepted that proposal.

### C.    *Markel Promises to Pay Incentive Payments.*

41.    With Markel's own stock price falling nearly 9% the day after the announcement, representing a loss of more than $1 billion in market capitalization, and continuing to fall by nearly 17% throughout December 2018, Markel's executives, including Co-Chief Executive Officer Richard Whitt and General Counsel Richard Grinnan, requested that Mr. Belisle delay or forfeit the incentive CSE and PE compensation payments that were scheduled to vest on December 31, 2018.

42.    However, on December 13, 2018, during a telephone call among Messrs. Belisle, Whitt, and Grinnan, among others, Mr. Whitt stated that that all other Markel CATCo employees, including Plaintiff, would "definitely" receive their incentive payments.  Whitt then confirmed that Mr. Belisle could communicate confirmation of the incentive payments to the entire staff, including Plaintiff, immediately following this telephone call, which he did.

43.    On December 31, 2018, Plaintiff was fully vested in her 2018 CSB of $125,000, would at subsequent year-ends be entitled to an additional $325,000 in CSB payments, and would on March 31, 2019 be entitled to a $7,000,000 Retention Bonus.  The $325,000 and $7,000,000 payments vested immediately in the event of a termination without cause.  All were forfeited in the event of a termination for cause.

44.    Defendants did not have cause to terminate Plaintiff or Mr. Belisle, so, they developed a scheme to do so.

45.     By means of an unauthorized and unlawful invasion of Plaintiff's privacy, Markel found its purported justification for depriving Plaintiff of millions of dollars that would shortly be due and owing to her:  On or shortly after December 4, 2018, Markel, with the assistance of vendors, accessed and then reviewed personal and private communications on electronic devices that they had demanded Plaintiff and Mr. Belisle provide for imaging, purportedly for use in the Government Inquiry.  This review occurred despite the fact that Defendants did not have permission from Plaintiff or Mr. Belisle to conduct a review of their personal, non-company accounts on their personal devices.

46.     Markel's deceptive actions undertaken in an attempt to avoid Markel CATCo's obligations to Plaintiff, which would immediately impact Markel's profits from Markel CATCo, did not end there.  Representatives of Markel began asking probing questions about portfolio strategy and how the business operates.  On information and belief, these actions were part of the coordinated scheme to remove Plaintiff and Mr. Belisle from their positions and avoid making the incentive payments, while, at the same time, providing Markel with information about the portfolio strategy and how the Markel CATCo business operates in order to run the company after Plaintiff and Mr. Belisle were no longer employed.

47.     On January 13, 2019, Markel Corp's Human Resources ("HR") department, which provided shared services for Markel CATCo, informed all Markel CATCo employees, including Plaintiff and Mr. Belisle, that they would receive their respective incentive payments on January 30, 2019.  As explained below and herein, however, no such payment has been made to Plaintiff or to Mr. Belisle.

### D. The Skadden "Interview."

48. On or about January 15, 2019, attorneys from Skadden contacted Plaintiff to schedule an interview. Skadden disingenuously described the interview as a "follow-up" to earlier interviews between Skadden and Plaintiff concerning the Government Inquiry.

49. Skadden scheduled an interview with Mr. Belisle for earlier on the same day of Plaintiff's interview. Mr. Belisle was also disingenuously informed by Skadden that the "interview" would be a "follow-up" to earlier interviews in which he participated, arising from the Government Inquiry.

50. The "interviews" occurred on January 17, 2018. Although each interview began with an initial, fairly high-level discussion regarding loss reserves, Plaintiff quickly realized that the meetings were not scheduled for the purpose of learning information about that topic. Instead, Skadden informed Plaintiff that Markel or others on its behalf had accessed her personal communications without her knowledge or authorization. Based on communications they had improperly accessed, Skadden accused Plaintiff of engaging in an undisclosed personal relationship with Mr. Belisle. Skadden claimed that the existence of the relationship was a violation of Markel's Code of Conduct and Plaintiff's employment agreements, although no such prohibitions existed in the agreements, in the Code as it existed on December 31, 2018, or in any Code as applied to a subordinate employee involved in a personal relationship with her superior.

51. Markel and Skadden demanded that Plaintiff and Mr. Belisle surrender their phones and other electronic devices a second time, to be imaged again. Plaintiff and Mr. Belisle were again told, incorrectly, that even if a device was personal – such as a personal smartphone that the employees had purchased with their own money – they were required to provide it to be imaged. Based on these demands and under the continued, misinformed belief that they had no

choice and no right to privacy in their personal accounts, Plaintiff and Mr. Belisle again provided their personal smartphones and other devices to Consilio for imaging.

### E.      Markel's Code of Conduct.

52.      Prior to January 1, 2019, Markel's Code of Conduct, which Markel contends is applicable to its subsidiaries such as Markel CATCo, did not contain a provision prohibiting or discussing personal relationships between employees.  *See* Ex. 2, ECF No. 1-2 (the "Pre-2019 Code of Conduct").  Although the Code of Conduct had a section regarding "Conflicts of Interest," the text and examples made it clear that Markel's Pre-2019 Code of Conduct related to business relationships that could give rise to business conflicts of interest.  By its own terms the Pre-2019 Code of Conduct was intended "to guide . . . business dealings."  *Id.* at 4.  The code expressly clarifies that it "is not a contract of employment and does not create any contractual rights of any kind between the Company and its Associates, Executive Officers or Directors." *Id.* at 7.

53.      At some time on or about December 4, 2018, after imaging Plaintiff's and Mr. Belisle's personal cell phones, including their personal accounts on those phones, Defendants became aware that Plaintiff and Mr. Belisle had developed a personal relationship.  Thereafter, Markel, without notice to Markel CATCo Management including Plaintiff, purported to amend its own Code of Conduct, to which it claims Markel subsidiaries were subject, to state:  "Having a relationship with another Employee in the Company when one Employee directly or indirectly supervises the other Employee" is a potential or actual "Conflict of Interest."  *See* Ex. 3, ECF No. 1-3 (the "Substitute Code of Conduct").  The Substitute Code of Conduct bears the date January 2019 and appears to have been first posted online on January 7, 2019, even though it had not been adopted by Markel CATCo.  The Substitute Code of Conduct contains a disclaimer like

the prior version, which makes clear that it "is not a contract of employment and does not create any contractual rights of any kind between the Company and its Employees, Executive Officers or Directors." *Id.* at 4. Plaintiff and Mr. Belisle were never given the opportunity to review or sign the Substitute Code of Conduct, nor were they even aware of its existence before their termination, even though they were both officers and directors of Markel CATCo. The provision regarding personal relationships did not exist in prior versions of the Code of Conduct, which Plaintiff and Mr. Belisle did sign. The provision in the Substitute Code of Conduct cannot be read in any event as justifying termination of the subordinate employee in the relationship, i.e., Plaintiff.

54.     At no time did any relationship between Plaintiff and Mr. Belisle result in an improper conflict of interest, or create a situation that in any way interfered with or influenced Plaintiff's contribution to Markel or Markel CATCo, or impeded her ability to perform her work objectively and effectively. To the contrary, the promotions of Plaintiff discussed above were all in process before any personal relationship began, and Plaintiff's Incentive Payments were not from Markel CATCo funds but were, rather, granted by Mr. Belisle through the Belisle Allocations. In other words, as he customarily did with his key team members, he reduced his own payment by causing a well-earned portion to be due to Plaintiff.

55.     In addition, at the time of Plaintiff's promotion to CEO - Bermuda, her salary was increased commensurate with her new position as, prior to that time, her salary was significantly less than that of many of her direct reports. At all times, any changes in salary for Plaintiff were approved by Mr. Whitt and HR at Markel. Further, Plaintiff's most recent salary change was subject to a review of comparable roles at peer companies and was ultimately approved by both Mr. Whitt and Markel's HR and Compensation departments. As such, Plaintiff's salary changes,

as confirmed by Markel's Compensation team via an independent review, were fair and appropriate for the significant leadership role she had assumed at Markel CATCo.

### F. Plaintiff's Termination.

56.     On January 18, 2019, through corporate maneuvering that was not shared with Plaintiff or Mr. Belisle (despite the fact that they were both directors of Markel CATCo), Markel elected five new, additional members to the Markel CATCo Board, whose terms were to commence immediately.  All of the new members were under the control of Markel.  Markel CATCo then convened a meeting of the Board of Directors, five of whom were directly controlled by Markel and four of whom, including Plaintiff and Mr. Belisle, were not.

57.     Plaintiff and Mr. Belisle were informed during the purported Board meeting that they were terminated, effective immediately, and that their respective incentive payments would not be paid.  The two actual Markel CATCo Board members apart from Plaintiff and Mr. Belisle declined to vote, and the terminations were carried out by the newly appointed Markel-sponsored "directors."

58.     Mr. Belisle offered to "cure" any perceived conflict of interest (although no such conflict existed) by resigning immediately, while Plaintiff continued as Chief Executive Officer of Markel CATCo.  Mr. Belisle was entitled to a notice and a cure period, neither of which Markel allowed; and his proposed actions would in fact have cured any conflict of interest, although none existed.  He expressed concerns to the newly constituted Board that, given the crucial roles that he and Plaintiff played, Markel CATCo could be rendered unable to survive, and its investors in the funds that it managed harmed, if he and Plaintiff were both terminated. The newly constituted Board ignored the entreaty, and continued to deny Mr. Belisle his contractual opportunity to cure the purported grounds for termination.

59.     On January 18, 2019, Plaintiff received a Notice of Termination of Employment from Mr. Grinnan, which specified that Plaintiff had been terminated for "Cause, as defined in [her] employment agreement."  The notice includes the baseless claim that Plaintiff "breached the Employment Agreement prior to December 31, 2018 and [was] not in good standing with [Markel CATCo] as of that date."  Therefore, Mr. Grinnan concludes, Plaintiff was ineligible for, and would not receive, any Incentive Payments – despite the fact that some of the payments had already vested before the termination and others were due and owing, or would be shortly, because no "cause" existed justifying her termination.  The notice ignores the fact that, as the subordinate in the relationship, Plaintiffs' conduct could not have been a terminable offense even if the hastily revised January 2019 Substitute Code of Conduct could be deemed to apply.

60.     Markel provided a similar message to Mr. Belisle, and refused to pay him any of his $65,950,000 in incentive payments, even though they were fully vested and payable.

61.     Later that same day, Markel issued a press release in which it falsely stated that Plaintiff had violated Markel policies as a result of her relationship with Mr. Belisle.  The press release further implied -- falsely -- that Plaintiff's termination was also somehow related to the Government Inquiry.

62.     On information and belief, on or about January 29, 2019 Markel CATCo convened a call with over 100 attendees, including investors and staff in the managed funds.  The President and Chief Underwriting Officer of Markel Global Reinsurance, Jed Rhoads, who was appointed as the interim head of Markel CATCo, began the call by stating that no questions would be taken and that the purpose was to address why Plaintiff's and Mr. Belisle's employment had been terminated.  Markel representatives went on to say that during the Government Inquiry, Markel uncovered the fact that Plaintiff and Mr. Belisle had engaged in an

undisclosed personal relationship, including during a period when Mr. Belisle was setting Plaintiffs' salary and bonuses. No mention was made that the salaries and bonuses were approved by Markel, or that the bonuses and other Incentive Payments were from the Belisle Allocations, not from funds of Markel or Markel CATCo. Further, the bonuses were fully in line with Plaintiff's position as Markel CATCo CEO-Bermuda, the highest position behind Mr. Belisle's own and one for which Plaintiff was selected before any personal relationship existed.

63. These statements and others that Markel and its agents have made are false and misleading, and portray a supposed conflict of interest that did not occur and a violation of a corporate policy that did not exist and would not in any event have applied to a subordinate employee.

64. Defendants' conduct was wanton, malicious, motivated by ill will and hostility and calculated to lead to a financial gain of tens of millions of dollars. Defendants developed a concerted plan, after invading Plaintiff's privacy, to surreptitiously alter Markel's Code of Conduct as a pretextual basis to terminate Plaintiff's employment without notice or opportunity to cure, thereby denying her substantial benefits under the Addendum. Moreover, Defendants then proceeded to invade her privacy further by publicly announcing the occurrence of a private personal relationship, falsely stating that the relationship constituted a conflict of interest in violation of a policy that did not exist and would not have applied, and falsely implying that the termination was also related to the Government Inquiry. All of this conduct was undertaken in an apparent attempt to cover up the actual monetary reason for Plaintiff's and Mr. Belisle's termination, and with the apparent goal of clouding her reputation to prevent or materially impair her ability to compete with Markel CATCo or Markel after her termination.

65. Following the termination and other improper actions, Markel General Counsel Richard Grinnan wrote to Plaintiff on January 21, 2019, and demanded that Plaintiff again turn over personal devices to Consilio. Despite the fact that litigation regarding Plaintiff's improper termination was likely, and despite the fact that Plaintiff may have had her own preservation obligations, Grinnan's letter announced that Consilio was going to image and then "delete information pertaining to the Company and its affiliates from the devices." The letter also falsely indicated that it was subject to the attorney/client privilege and work product protection.

66. Thereafter, Skadden reiterated the demand on behalf of Markel and Markel CATCo that Plaintiff provide personal devices to Consilio. Ultimately, in order to avoid immediate litigation, Plaintiff reached an agreement with Markel and Markel CATCo that her attorney would hold the vast majority of the information in escrow, and that neither Plaintiff nor her counsel would access the information unless and until they provided five (5) business days' notice before doing so.

### F. *Markel CATCo Refuses to Indemnify Plaintiff.*

67. Following the abrupt derogation of her contract rights under the Addendum, Plaintiff retained counsel to represent her, not only in connection with those contract rights, but also in connection with the Government Inquiry. Plaintiff understands that the Government Inquiry is focused on Markel CATCo's calculation of loss reserves during 2017 and 2018, when Plaintiff was first the Chief Risk Officer and then the CEO – Bermuda of Markel CATCo. In addition, Markel CATCo appointed Plaintiff to its Board of Directors in or about the Spring of 2017.

68. Plaintiff's conduct was legal and appropriate in every respect; indeed, her performance was recognized as exemplary by Markel and Markel CATCo, which in turn

prompted her rapid advancement at Markel CATCo. Nevertheless, her service on behalf of Markel CATCo is necessarily involved in the Government Inquiry, and Plaintiff understands that Markel and Markel CATCo have produced thousands of pages of documents involving Plaintiff in response to the Government Inquiry.

69. Paragraph 52.1 of the Bye-Laws of Markel CATCo dated June 2, 2016 (the "Bye-Laws") (attached hereto[2] as Ex. 4) expressly provides for indemnification of its directors and officers for conduct performed on behalf of Markel CATCo:

> The Directors, Secretary and other Officers . . . for the time being acting in relation to any of the affairs of [Markel CATCo] . . . shall be indemnified and secured harmless out of the assets of [Markel CATCo] from and against all actions, costs, charges, losses, damages and expenses which they . . . shall or may incur or sustain by or by reason of any act done, concurred in or omitted in or about the execution of their duty, or supposed duty, or in their respective offices or trusts . . . .

70. Plaintiff, through counsel, formally requested that Markel CATCo honor its indemnity obligation to her in connection with the Government Inquiry on February 12, 2019, both with respect to attorneys' fees already incurred and fees to be incurred in the future. On February 15, 2019, Markel and Markel CATCo denied her request, stating that their obligation to indemnify Plaintiff is discretionary. Markel and Markel CATCo have denied additional, follow-up requests as well.

71. Markel CATCo has not honored its indemnity obligation to date. Moreover, the Government Inquiry by its nature is indefinite with respect to its scope and the timing of its conclusion. Therefore, by refusing to guarantee reimbursement of Plaintiff's fees by a date certain, Defendants effectively have repudiated their obligation to indemnify and hold harmless Plaintiff going forward.

---

[2] Exhibit 4 was not included with the initial Complaint, and is attached hereto.

72.     Moreover, Defendants have frozen Plaintiff out of the Government Inquiry from its very outset and up to the present.

73.     As discussed above, Plaintiff was viewed within Markel CATCo as an expert with respect to loss reserves and recognition, which prompted her promotion first to Chief Risk Officer and then CEO – Bermuda.   Plaintiff necessarily has unique factual knowledge concerning the matters at issue in the Government Inquiry.

74.     Nevertheless, Defendants, through their counsel rebuffed Plaintiffs' offers and attempts to participate more directly in the Government Inquiry during her employment and have continued to do so through the present.  Among other things, Defendants have refused through counsel to identify to Plaintiff's counsel which of Plaintiff's documents have been disclosed in connection with the Government Inquiry or otherwise explain how the Defendants are responding to the Government Inquiry, unless Plaintiff will agree to stay this civil litigation and Mr. Belisle will agree to stay his separate litigation in the U.S. District Court for the District of New Hampshire.

75.     The Government Inquiry, which Markel gratuitously publicized in the first instance, has had negative consequences for Plaintiff, casting a pall over Plaintiff's future employment prospects that will continue until the Government Inquiry is resolved.  The fact that Plaintiff has been unfairly shut out of the process and been denied access to documentary evidence places her in an untenable position because she is effectively prevented from seeking other employment in her field.  Markel is thus precluding her from competing with its wholly owned subsidiary Markel CATCo, whose profits redound to Markel's benefit.

## COUNT I
## BREACH OF CONTRACT (MARKEL AND MARKEL CATCo)

76.     Plaintiff incorporates by reference Paragraphs 1 through 75 as if set forth fully herein.

77.     On or about October 19, 2018, Plaintiff and Markel CATCo entered into the Addendum, which superseded Schedule 2 to her employment agreement in its entirety and governed the parties' obligations with respect to the subjects covered by the Addendum, including Incentive Payments.

78.     Plaintiff performed her obligations to Markel CATCo in every material respect, up through and including January 18, 2019.

79.     Pursuant to the Addendum, Plaintiff's 2018 CSB vested on December 31, 2018, and Markel CATCo was obligated to pay it on or before January 30, 2019.

80.     Pursuant to the Addendum, when Markel CATCo terminated Plaintiff without cause, Markel CATCo became obligated to pay the full RB and any remaining CSB within thirty days of termination.  Addendum at 3.  It failed to do so.

81.     Plaintiff was terminated without cause and without notice on January 18, 2019.

82.     Markel CATCo has not remitted the 2018 CSB to Plaintiff and has repudiated its obligations to pay it and the remaining Incentive Payments, thereby breaching the Addendum and causing resulting harm to Plaintiff.

83.     Markel assumed control of the Markel CATCo Board of Directors in January 2019 in order to terminate Plaintiff's and Mr. Belisle's employment.

84.     By its unilateral exercise of control of its wholly owned subsidiary as of January 17 or 18, 2019, and the other actions described above, Markel demonstrated that it has been Markel CATCo's alter ego at least since that time.

85. Markel, through its alter ego Markel CATCo, materially breached Plaintiff's Addendum (a) by causing Markel CATCo to repudiate its obligation to pay Plaintiff's Incentive Payments under the Addendum, and (b) by terminating Plaintiff's employment without cause.

86. Alternatively, Markel's control of Markel CATCo created an agency relationship whereby Markel CATCo's acts as an agent are attributable to Markel as the principal.

87. Markel CATCo acted as Markel's agent with respect to Markel CATCo's breaches of the Addendum, and Markel is liable for those breaches as Markel CATCo's principal.

88. In sum, Markel is liable along with Markel CATCo for the breach of Plaintiff's rights pursuant to the Addendum, either because Markel CATCo made itself the alter ego of Markel CATCo or because Markel was the principal on whose behalf its agent Markel CATCo acted.

## COUNT II
## WRONGFUL DISMISSAL/VIOLATION OF ADDENDUM
## (MARKEL AND MARKEL CATCo)

89. Plaintiff incorporates by reference Paragraphs 1 through 88 as if set forth fully herein.

90. As detailed above, Plaintiff and Markel CATCo entered into the Addendum on or about October 19, 2018. The Addendum modified Plaintiff's contract of employment with Markel CATCo and includes a specific term of employment through December 31, 2020.

91. Plaintiff performed her obligations under the Addendum in every material respect, up through and including January 18, 2019, when Plaintiff was summarily terminated by Markel CATCo.

92.     Defendants lacked just cause for terminating Plaintiff's employment under the Addendum, and there is no basis to assert that Plaintiff's performance under the Addendum constituted gross misconduct that is required under Bermuda law for summary termination.

93.     Defendants failed to give Plaintiff reasonable notice of her termination of employment under the Addendum.

94.     Markel CATCo has not remitted the 2018 CSB to Plaintiff and has repudiated its obligations to pay it and the remaining Incentive Payments, thereby breaching the Addendum and causing resulting harm to Plaintiff.

95.     As described above, Markel CATCo acted as the alter ego or agent of Markel when it terminated Plaintiff without cause or notice.  Markel is therefore liable along with Markel CATCo for wrongful dismissal of Plaintiff.

**COUNT III**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(MARKEL AND MARKEL CATCo)**

96.     Plaintiff incorporates by reference Paragraphs 1 through 95 as if set forth fully herein.

97.     In every agreement, including the Addendum, there is an implied covenant that the parties will act in good faith and fairly with another.  Contracting parties are prohibited from behaving in a manner inconsistent with the parties' common purpose and justified expectations.

98.     If, for any reason, Markel CATCo is found not to have breached the Addendum, Markel CATCo nonetheless breached the covenant of good faith and fair dealing.  Markel and Markel CATCo were alter egos, or in a principal/agent relationship.  Markel is therefore liable along with Markel CATCo for violation of the implied covenant of good faith and fair dealing.

99.     When Skadden appeared at the offices of Markel CATCo in Bermuda in early December of 2018, Skadden demanded the personal cell phones and other personal devices of

the Markel CATCo employees.  Markel, acting through its agent Skadden, violated Plaintiff's privacy by informing her that she was required to turn over her personal cell phone for imaging, while causing her to believe that only company accounts would be imaged.  Without notice or authorization, Markel, acting through its agent Skadden, caused Plaintiff's personal accounts on her personal cell phone to be imaged.  Markel and Markel CATCo then used that improperly obtained personal data as a pretextual basis to terminate Plaintiff's employment with Markel CATCo.

100.    In addition, Markel replaced the Pre-2019 Code of Conduct with the Substitute Code of Conduct to include personal relationships as conflicts of interest, without notice to or action by, the Markel CATCo directors or officers.

101.    Markel and Markel CATCo then terminated Plaintiff's employment and denied her Incentive Payments that had already vested on December 31, 2018 and that would vest or become payable soon, on the basis that she had violated the Substitute Code of Conduct, about which she knew nothing and which would not have applied to her as the subordinate employee in any event.

102.    Further, Markel and Markel CATCo announced publicly (a) that Plaintiff's employment was being terminated for engaging in a personal relationship, thereby further violating her privacy rights; (b) that the relationship violated company policy, when the policy had only been modified after January 1, 2019 and would not have applied to her as the subordinate employee in any event; and (c) that the Government Inquiry was occurring simultaneously with the termination, thereby falsely implying a relationship between the termination and the Government Inquiry.  Markel's and Markel CATCo's conduct as alleged in

the foregoing paragraphs, individually and collectively, violates the implied covenant of good faith and fair dealing.

103.    Markel and Markel CATCo's breach of the implied covenant of good faith and fair dealing has caused, and continues to cause, injury to Plaintiff, including but not limited to, failure to pay the Incentive Payments which she is due under the Addendum, injury to reputation, and distress and embarrassment attendant upon the invasion of her privacy rights.

**COUNT IV**
**INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**
**(MARKEL)**

104.    Plaintiff incorporates by reference Paragraphs 1 through 103 as if set forth fully herein.

105.    In the event that Markel is not deemed to be an alter ego of Markel CATCo or in a principal/agency relationship with Markel CATCo, with regard to breaching Plaintiff's contract rights under the Addendum and/or the implied covenant of good faith and fair dealing  (Counts I and III), and with regard to participating in her wrongful dismissal (Count II), Markel nonetheless caused or contributed to causing injury and damages to Plaintiff.

106.    As discussed above, the Addendum is a valid and enforceable agreement between Plaintiff and Markel CATCo, and Plaintiff performed her obligations under the Addendum in every material respect before she was terminated without cause and without notice.

107.    Markel was fully aware of Plaintiff's contractual relationship pursuant to the Addendum with Markel CATCo.  However, Markel stood to benefit financially in a substantial amount up to $7,340,000, and to benefit further financially by removing her as a competitor in the narrow market that she shares with Markel CATCo.

108.    As more fully alleged above, Markel acted intentionally and with actual malice to cause Markel CATCo to (a) breach its contractual obligations to Plaintiff under the Addendum,

(b) wrongfully terminate her employment, and (c) violate the covenant of good faith and fair dealing implied by law.

109.     Markel's interference with Plaintiff's contractual relationship with Markel CATCo has caused, and continues to cause, injury to Plaintiff, including but not limited to, the failure to receive the payments that she is due under the Addendum.

## COUNT V
## UNJUST ENRICHMENT (MARKEL AND MARKEL CATCo)

110.     Plaintiff incorporates by reference Paragraphs 1 through 108 as if set forth fully herein.

111.     Markel CATCo is a wholly owned subsidiary of Markel, such that Markel benefited financially through Markel CATCo as a result of Plaintiff's activities.  For example, in conjunction with Mr. Belisle, Plaintiff raised $2.3 billion in the Fall of 2017 for Markel CATCo's private and public finds.

112.     Markel, as the owner of Markel CATCo, realized substantial benefits from Plaintiff's performance from March 2016 through January 2019, reflected in the annual revenue of Markel CATCo during that period.

113.     Markel, either itself or in conjunction with its subsidiary and alter ego Markel CATCo, has retained for its own benefit the Incentive Payments due to Plaintiff.

114.     In light of Markel's misconduct culminating in the wrongful dismissal of Plaintiff, it is unconscionable for Markel to retain the benefit of Plaintiff's services and to withhold the Incentive Payments from Plaintiff.  Alternatively, it is unconscionable for Markel to passively accept through Markel CATCo the benefits of Plaintiff's services and to retain Plaintiff's Incentive Payments.

115.    Markel and Markel CATCo have been unjustly enriched at the expense of Plaintiff by their wrongful conduct, such conduct including without necessary limitation her wrongful dismissal on pretextual grounds in order to avoid paying Incentive Payments due to her and to Mr. Belisle.

## COUNT VI
## DEFAMATION (MARKEL AND MARKEL CATCo)

116.    Plaintiff incorporates by reference Paragraphs 1 through 115 as if set forth fully herein.

117.    On January 18, 2019, Markel issued a press release stating that Plaintiff and Mr. Belisle violated "Markel policies relating to an undisclosed personal relationship," and were "no longer with the company" following "prompt action . . . taken" by Markel.  The January 18, 2019 press release sandwiched these statements regarding Plaintiff's and Mr. Belisle's dismissal, which constitute an invasion of privacy as discussed below, with references to the Government Inquiry, even though the personal relationship is entirely unrelated to the latter.

118.    Markel    published    the    press    release    on    its    website    at http://www.markelcorp.com/About-Markel/NewsRoom/Reuters2383940; issued the press release to PRNewswire, Reuters, and to an unknown number of other media organizations for further public dissemination; and filed the press release with the Securities and Exchange Commission's EDGAR system on an 8-K Form.

119.    On information and belief, Markel and others acting at its behest (including new officers of Markel CATCo installed by Markel in conjunction with the dismissal of Plaintiff and Mr. Belisle) have likewise made oral statements to third parties, including investors, that Plaintiff and Mr. Belisle were terminated because they breached their respective employment agreements, engaged in actions that subjected them to a conflict of interest, and violated Markel's code of

conduct. These oral statement have occurred, among other times, during a call with investors on or about January 29, 2019.

120. Defendants' press release and oral statements regarding Plaintiff's dismissal were false and defamatory, because Plaintiff did not violate any applicable Markel policy in existence prior to January 1, 2019 and did not engage in actions that gave rise to a conflict of interest, and because the Substitute Code of Conduct would not have applied to her as the subordinate employee in any event.

121. Defendants' press release and oral statements were also false and defamatory by omission, inasmuch as they state that Plaintiff and Mr. Belisle violated Markel's policies, while omitting that:

      a. With knowledge of Plaintiff and Mr. Belisle's relationship, but without prior notice or approval from the Markel CATCo Board, Markel created the Substitute Code of Conduct, which Markel modified after January 1, 2019 to require disclosure of personal relationships;

      b. Plaintiff as the subordinate employee would not be subject to termination under the Substitute Code of Conduct in any event;

      c. Markel did not notify either Plaintiff or Mr. Belisle that it had created the Substitute Code of Conduct to prohibit undisclosed relationships, notwithstanding that Markel knew of their relationship; and

      d. Plaintiff and Mr. Belisle's relationship was not in violation of Markel's Code of Conduct, certainly as it existed prior to January 2019, because the Substitute Code of Conduct was never properly adopted, nor was it accepted by Plaintiff or Mr. Belisle.

122. Defendants' statements were also false and/or false by omission to the extent that they state that Plaintiff's and Mr. Belisle's employment was terminated in the course of Markel's internal review related to the Government Inquiry, thereby implying a connection between the termination and the Government Inquiry while omitting the fact that the relationship and the termination were entirely unrelated to the Government Inquiry.

123. Under the circumstances in which the statements were made, a reasonable observer would believe – incorrectly – that Plaintiff's abrupt termination was for cause, namely violating Markel's Code of Conduct in connection with the Government Inquiry.

124. Each of Defendants' misrepresentations and misleading statements, and all of them collectively, have held Plaintiff up to scorn, ridicule, disgrace or contempt in the mind of a considerable and respectable segment of the community, and have damaged her reputation and business opportunities.

125. Defendants' statements were not matters of legitimate public concern, and they were not justified in publicly impugning Plaintiff's professional and personal reputation.

126. At the time the statements were made, Defendants knew, or at the very least should have known, that the statements were false and/or that they had omitted material additional information rendering the statements misleading.

127. Defendants' statements have caused, and continue to cause, injury to Plaintiff's personal and business reputations, the full extent of which is not yet known to Plaintiff.

## COUNT VII
## INVASION OF PRIVACY (MARKEL AND MARKEL CATCo)

128. Plaintiff incorporates by reference Paragraphs 1 through 127 as if set forth fully herein.

### A. Intrusion Upon Seclusion and Solitude

129. On or about December 4, 2018, Markel and Skadden demanded that Plaintiff surrender her phone and other electronic devices to be imaged and/or searched. Markel and Skadden falsely represented that even if a device was personal, Plaintiff was required to provide it for imaging, and led Plaintiff to believe that the imaging would be limited to corporate accounts on the devices.

130. Based on these demands, Plaintiff provided her personal smartphone and other personal and company-owned devices to Markel's agents. Plaintiff did not authorize the imaging or review of her personal, non-corporate accounts.

131. On or about January 17, 2019, Markel and Skadden again demanded that Plaintiff make her personal smartphone available to Markel's agents for copying. Again, based on the demand and disingenuous representations, Plaintiff provided her phone but did not authorize the imaging or review of her personal, non-corporate accounts.

132. Plaintiff's smartphone includes extensive electronic data related to Plaintiff's private life that is entirely unrelated to either the Government Inquiry or Plaintiffs' employment at Markel CATCo, and that she neither understood would be, nor authorized to be, imaged or reviewed. Markel CATCo knew or should have known that Plaintiff's smartphone included extensive data concerning Plaintiff's private life that she wished to keep confidential.

133. As a result of the prior imaging if not otherwise, Markel CATCo, and their agents knew that Plaintiff's smartphone contained extensive information concerning Plaintiff's private life that was entirely unrelated to either the Government Inquiry or Plaintiff's employment at Markel CATCo.

134. Defendants Markel CATCo, and Markel acting as alter ego to Markel CATCo, further invaded Plaintiff's privacy by unnecessarily and maliciously announcing that Plaintiff

had been terminated because of a personal relationship that purportedly violated a Company policy that did not exist at any relevant time and would not have applied to Plaintiff as the subordinate employee in any event.

135.   Plaintiff has been harmed by Defendants' intrusion upon her solitude and seclusion, both because her personal information was accessed without authorization and used as an unlawful basis to terminate her employment, and because her personal information was unnecessarily announced in a manner designed to embarrass and interfere with her relationships.

### B.   Public Disclosure of Private Facts

136.   On information and belief, Defendants discovered Plaintiff's personal relationship with Mr. Belisle through unauthorized review of Plaintiff's personal correspondence and documents.

137.   Plaintiff's personal relationship with Mr. Belisle was private and is of no legitimate concern to the public.

138.   Defendants publicized Plaintiff's private personal relationship to the public at large through, among other means, issuing a press release, filing a form 8-K with the Securities and Exchange Commission, and making oral statements to Markel CATCo investors, employees, and others.

139.   Plaintiff did not authorize or consent to Defendants' communication of her private personal relationship to the public at large.

140.   Plaintiff has been harmed by Defendants' public disclosure of private facts concerning Plaintiff, both because her private information was used as an unlawful basis to terminate her employment, and because it was publicly announced in a manner designed to embarrass and interfere with her family relationships.

141.    Defendants' invasions of Plaintiffs' privacy through intrusion upon seclusion, unauthorized accessing and use of private facts and unnecessary public disclosure of private facts have caused, and continue to cause, injury to Plaintiff's personal and business reputations, the full extent of which is not yet known to Plaintiff.

## COUNT VIII
## DECLARATORY JUDGMENT OF OBLIGATION TO INDEMNIFY
## (MARKEL AND MARKEL CATCo)

142.    Plaintiff incorporates by reference Paragraphs 1 through 141 as if set forth fully herein.

143.    Markel CATCo's Bye-Laws require it to indemnify and hold harmless its current and former directors and officers for conduct undertaken on behalf of Markel CATCo.

144.    Plaintiff was a director of Markel CATCo beginning in the Spring of 2017 and continuing through her termination on January 18, 2019.

145.    The Government Inquiry concerns aspects of Markel CATCo's business during 2017 and 2018 in which Plaintiff was directly involved, first in her capacity as Chief Risk Officer and then as CEO – Bermuda.

146.    Plaintiff has retained counsel to represent her in connection with the Government Inquiry and has incurred liability for fees and costs as a result.

147.    Plaintiff requested reimbursement of fees incurred to date and fees to be incurred in the future from Markel CATCo in accordance with the Bye-Laws.  Markel CATCo has refused to reimburse Plaintiff and has stated that they will not reimburse her fees going forward.

148.    Defendants have not stated or otherwise claimed that Plaintiff engaged in fraud or dishonesty in connection with the Government Inquiry, nor did she.

149.    By repudiating Plaintiff's indemnity request, Markel CATCo has breached its obligation to Plaintiff pursuant to the Bye-Laws.

150. As Markel CATCo's alter ego or principal in a principal/agent relationship, Markel is liable for Market CATCo's refusal to honor its indemnification obligation.

151. Plaintiff has suffered harm and continues to be harmed by Defendants' refusal to indemnify her.

152. Because Defendants refuse to honor their obligations to indemnify Plaintiff now and in the future for her representation with respect to the Government Inquiry, and because Plaintiff is already incurring liability for legal fees and costs in connection with the latter, an actual controversy exists between Plaintiff and Defendants, such that this matter is justiciable now pursuant to 28 U.S.C. § 2201.

153. Plaintiff is entitled to a declaration that Defendants are obligated to indemnify her in connection with the Government Inquiry, including, but not limited to, reimbursement of her attorneys' fees and costs.

### COUNT IX
### DECEPTIVE AND UNFAIR ACTS AND UNFAIR METHODS OF COMPETITION IN THE CONDUCT OF TRADE OR COMMERCE
### (MARKEL)

154. Plaintiff incorporates by reference Paragraphs 1 through 152 as if set forth fully herein.

155. Defendant Markel has undertaken a campaign of deceptive and unfair acts to harm Plaintiff in her trade or commerce. The effect and apparent intent of such acts is to impede or prevent Plaintiff from competing with Markel's wholly owned subsidiary Markel CATCo in the narrow market shared by Plaintiff and Markel CATCo. In addition, the acts permit Markel to derive the financial benefits that flow to it when Markel CATCo is able to retain $7,340,000 in Incentive Payments due and owing to Plaintiff.

156.    Markel's deceptive and unfair acts during her employment by Markel CATCo include, but are not limited to:

    a.  Invading Plaintiff's privacy by accessing communications unrelated to her employment on multiple occasions;

    b.  Surreptitiously altering the Pre-2019 Code of Conduct as pretext for wrongfully dismissing Plaintiff and Mr. Belisle; and

    c.  Conspiring with Markel CATCo to find a pretextual reason for wrongfully dismissing Plaintiff and Mr. Belisle in order to avoid tens of millions of dollars in Incentive Payments due, or about to be due, to them.

157.    Markel's deceptive and unfair acts after her wrongful dismissal include but are not limited to:

    a.  Gratuitously publicizing Plaintiff's wrongful dismissal, while falsely claiming that she had breached Markel's Code of Conduct and implicitly connecting her dismissal with the Government Inquiry;

    b.  Attempting to require Plaintiff to destroy all company electronic materials and communications on her device, even though that could be deemed spoliation in the context of the Government Inquiry;

    c.  Insisting that all company electronic materials and communications on her device be held in escrow, pending a notice period designed and intended to allow Markel to seek an order prohibiting the release of the materials and communications to her or the destruction of such materials and communications; and

     d.   Refusing to provide legally required indemnification, unless she agrees to refrain from asserting her contractual and legal rights in this Action in Massachusetts.

158.    Defendants' deceptive and unfair acts and unfair trade practices constitute a violation of G.L. c. 93A §11.  Defendants' acts, both singly and collectively, have caused and continue to cause harm to Plaintiff by sullying her reputation, denying her contractual benefits, and impeding her from competing in the relevant market.

159.    At all relevant times, Markel was engaged in trade or commerce, including the provision of insurance and investment services within Massachusetts.

160.    On information and belief, Markel does not maintain a place of business in Massachusetts or maintain assets within Massachusetts.

161.    Markel's unlawful acts have caused harm, injury and damage to Plaintiff, a Massachusetts resident, in Massachusetts.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered in her favor for:

a.    Contractual damages against both Defendants to Plaintiff in the amount of the Incentive Payments as provided in the Addendum or as required by the implied covenant of good faith and fair dealing, and such other and consequential damages as are appropriate;

b.    In the alternative to prayer "a" as to Markel only and only in the event that Markel is held not to be an alter ego or principal to Markel CATCo, damages for intentional interference with Plaintiff's contractual relations with Markel CATCo;

c.    Compensation and damages against both Defendants to Plaintiff for harm caused to her reputation and for emotional distress;

c.      Treble damages and reasonable attorneys' fees and costs against Markel as provided by Mass. Gen. Laws ch. 93A;

d.      Pre-judgment, post-judgment, and statutory interest;

e.      Attorneys' fees and costs on any other basis that may be available;

f.      A declaratory judgment  that Markel and Markel CATCo are obligated to indemnify Plaintiff with respect to the Government Inquiry or related investigation; and

g.      Such other and further legal relief as the Court may deem just and proper.

### JURY TRIAL DEMAND

Plaintiff demands trial by jury of all claims so triable.

Respectfully submitted

ALISSA FREDRICKS,

By her attorneys,


*/s/* Joan A. Lukey
Joan A. Lukey (BBO#: 307340)
joan.lukey@choate.com
Justin J. Wolosz (BBO#: 643543)
jwolosz@choate.com
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
Tel.: (617) 248-5000
Fax: (617) 248-4000

Date: March 28, 2019

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants.


/s/ Joan A. Lukey
Joan A. Lukey (BBO# 307340)


Dated: March 28, 2019