# Exhibit 1

*Employment Agreement between*
*Plaintiff and MCIM dated December 21, 2016*

DATED:  December  21  , 2016


Markel CATCo Investment Management Ltd.

and

Alissa Fredricks


---

## EMPLOYMENT AGREEMENT

---

**THIS AGREEMENT** is made this __21__ day of December, 2016

**B E T W E E N**:

(1)     Markel CATCo Investment Management Ltd. (the "Company");

and

(2)     Alissa Fredricks (the "Employee")

**IT IS AGREED** as follows:

1.      **Certain Definitions**

1.1     In this Agreement, including the Schedules, the following words and expressions shall, unless the context otherwise requires, have the following meanings:

| Word or Expression | Meaning |
| --- | --- |
| **"affiliate"** | with respect to a given entity (including the Company), any other entity that owns or controls, is owned or controlled by, or is under common ownership or control with, such entity; |
| **"Board"** | the board of directors of the Company; |
| **"Effective Date"** | a date, after the Employee relocates her principal residence and moves to Bermuda, upon which the Employee commences her employment with the Company in Bermuda pursuant to this Agreement (which, for avoidance of doubt, will be after the "Commencement Date" specified in Schedule 1), which date shall be mutually agreed in writing by the Company and the Employee, subject to Work Permit Approvals; |
| **"Insurance"** | insurance and reinsurance business; |
| **"Business Rules"** | any laws, regulations, requirements, codes of conduct, standards of best practice or any other rules published by the Bermuda Monetary Authority or any other regulatory |

| | authority having jurisdiction over the Company or the Employee, which may exist or relate from time to time in respect of the sale or placement of, or dealing or handling with, any Insurance, or any amendment, extension or variation of any Insurances, or the handling of monies or policy/product documents in relation to any Insurances, or any undertakings, commitments, obligations or responsibilities to any Regulatory Organisation; |
|---|---|
| **"Purchase Agreement"** | that certain agreement relating to the sale and purchase of the assets and business of CATCo Investment Management Ltd. and CATCo-Re Ltd., dated as of September 9, 2015, by and among the Company, Markel Corporation, CATCo Investment Management Ltd., and CATCo-Re Ltd; |
| **"Regulatory Organisation"** | the Ministry of Finance, the Bermuda Monetary Authority and any subdivision thereof, and any other regulatory authority having jurisdiction over the Company or the Employee; |
| **"Work Permit Approvals"** | means any type of work permit issued to the Company in respect of the Employee by the Bermuda Department of Immigration, whether it is a standard work permit, a short term work permit or a global work permit. |

2. **Appointment and Term**

2.1   The Company appoints the Employee, and the Employee accepts appointment with the Company, to that position and title detailed in Schedule 1.

2.2   The Employee shall during the Employee's employment under this Agreement serve the Company in the position given in Schedule 1 (the "Position").

2.3   The employment of the Employee under this Agreement shall be terminable by written notice given by the Employee to the Company, or by or on behalf of the Company to the Employee, or upon such other circumstances as are described in this Agreement. The notice period (where applicable) to be given by one party

to the other shall be as stated in Section 10.3 below. The Term of the Employee's employment shall be as stated in Schedule 1.

3.  **Principal duties of the Employee**

3.1 While employed under this Agreement, the Employee will:

(a) undertake and faithfully and diligently perform all such duties, and exercise such powers and functions, as may be assigned to or vested in the Employee from time to time by the Chief Executive Officer (the "CEO"), the Chief Operating Officer (the "COO"), or the Board;

(b) use the Employee's reasonable endeavours to achieve such targets, benchmarks and goals as are set by the CEO, the COO, or the Board for the promotion and growth of the Company;

(c) at all times conform to the reasonable and lawful directions of the CEO, the COO, or the Board;

(d) devote the whole of the Employee's working time, attention and skills to the development of the Employee's business within the Company and affairs of the Company (as required by the CEO, the COO, or the Board); and

(e) act at all times in the best interests, and promote and protect the interests, of the Company.

3.2 During the Term, the Employee shall:

(a) remain properly appraised with all Business Rules connected with the performance of the Employee's obligations to the Company (as the case may be) under this Agreement, and for the conduct of business with and on behalf of clients or prospective clients of the Company and investors in the investment funds of the Company on behalf of whom the Employee is to act;

(b) comply in all material respects with all Business Rules, and whether such matters are binding on the Employee personally or the Company;

(c) promptly declare in writing, so far as the Employee is aware of the same, the nature of any personal interest, whether direct or indirect, in any contract or proposed contract entered into by the Company; and

(d) conduct the Employee and the Employee's activities on behalf of the Company in compliance with all proper standards of corporate governance and all applicable policies and codes of the Company and its affiliates.

3.3 The Employee shall immediately give to the Company full written details of all communications and correspondence the Employee may have with any Regulatory Organisation whether in relation to this appointment, or any previous appointment, subject to Section 14 below.

3.4    The Employee acknowledges the right of the Company whether during the Term or at any time after it has terminated to notify and otherwise deal with any appropriate Regulatory Organisation in connection with any conduct of the Employee which does not (or is alleged not to) comply with any Business Rules, or the spirit of such Business Rules.

3.5    Subject in each case to Section 14 below, if the Employee becomes aware of any circumstances which may or are likely to lead to a complaint or claim being made against the Company, or which may require notification to a Regulatory Organisation, whether for negligence, breach of duty or otherwise, then the Employee should immediately notify the Company in writing pursuant to Section 12 below. In respect of such complaint or claim, the Employee shall:

(a)    not admit or acknowledge any liability or responsibility;

(b)    provide such details and reports as the Company may require; and

(c)    co-operate in full with all reasonable and proper requests and instructions of the Company, professional indemnity insurers of the Company, or the relevant Regulatory Organisation.

3.6    Without limiting the full observance by the Employee of the Business Rules, the Employee undertakes that in the conduct of any Insurance business, the Employee will give a true, complete and accurate description of the risks involved to the relevant investor in the investment funds offered by the Company, and that in relation to any investor, the Employee will act in such investor's best interests at all times.

4.    **Restriction on other activities by the Employee**

The Employee agrees that during the Term, the Employee will not (except with the prior written sanction of the CEO, the COO, or the Board):

(a)    be actively engaged in the conduct of any other commercial business;

(b)    be directly or indirectly concerned or interested in any business which is in competition with or in opposition to any business for the time being carried on by the Company; or

(c)    hold the stock of any client of the Company or of any of its affiliates.

5.    **Place of work**

The Employee shall be based at the offices as stated in accordance with Schedule 1, but shall undertake such travel as may be required for the proper discharge of the Employee's duties.

6.    **Remuneration and expenses**

6.1    During the Term, the Employee shall be paid by the Company a salary at the gross annual rate specified in Schedule 1, which shall be payable by monthly instalments in arrears in accordance with the Company's regular payroll policy,

and which shall be deemed to accrue from day to day. In addition, the Employee shall be eligible for Incentive Compensation set out in Schedule 2. The salary payable under this clause 6.1 and the remuneration arrangements of the Employee shall be reviewed by the Company annually. While a review does not imply any entitlement to an increase, the rate of salary payable to the Employee may be increased as a result of such review with effect from any date specified by the Company.

6.2    In addition, there shall be refunded to the Employee all necessary and reasonable out-of-pocket expenses properly incurred by the Employee on the business of the Company and in accordance with the Company's business expense reimbursement policies.

6.3    All amounts in this Agreement (including the Schedules) that are designated in U.S. dollars ($) shall be payable in the applicable local currency in which the Employee will be paid, in each case determined based on the applicable exchange rate in effect on the Effective Date.

## 7.    **Employee Benefits and Holiday**

7.1    During the Term, the Employee shall be eligible to participate in such employee benefit plans (including with respect to holiday, holiday accrual and sick leave), and to receive such other fringe benefits, as the Company may in its discretion make available to its Bermuda employees generally, subject to all present and future terms and conditions of such benefit plans and other fringe benefits (in each case as in effect, amended or terminated from time to time in the Company's discretion for similarly situated employees generally).

7.2    The Employee shall have the option each calendar year during the Term to take up to five (5) days of additional unpaid time off provided that the Employee consents in writing to the understanding that the Employee shall not be paid for such additional days off (e.g., shall not receive the Employee's regular base salary for those days); provided further, however, that in no event shall the aggregate amount of paid and unpaid time off taken by an Employee in any calendar year exceed the maximum time off allowable for any employee under the Company's Paid Time Off policy as in effect or amended from time to time.

## 8.    **Confidentiality**

8.1    The Employee acknowledges that all notes, lists, memoranda, records, slips and other writings (in whatever form and whether held in hard copy or any electric medium) made by or at the behest of, or in the possession or custody of, the Employee relating to the business of the Company, shall be and remain the property of the Company, and shall be handed over by the Employee to the Company from time to time on demand and in any event upon the termination of the Employee's employment.

8.2    The Employee agrees and covenants with the Company, as follows, subject in each case to Section 14 below:

(a)     The Employee will not at any time whether during or after the termination of the Employee's employment by the Company, reproduce, use, communicate or attempt to do so to any person whatsoever any Confidential Information (as defined in Schedule 4 below), nor through any failure to exercise all due care and diligence cause any unauthorised disclosure of any such Confidential Information except where the same shall already be in the public domain other than by unauthorised disclosure by the Employee;

(b)     The Employee will at all times during the Employee's employment use all reasonable endeavours to prevent unauthorised publication or disclosure of any Confidential Information as referred to in sub-paragraph (a);

(c)     The Employee will not at any time during the Employee's employment make, other than for the benefit of the Company, any lists, notes or memoranda relating to any matter within the scope of and directly or indirectly concerning the business, dealings or affairs of the Company;

(d)     The Employee will not use during or after termination of the Employee's employment any Confidential Information for any purpose whatever, including without limitation for the Employee's own benefit, for that of any other party or in any way to the detriment of the Company.

9.      **Intellectual Property and Restrictive Covenants**

9.1     The Employee hereby acknowledges that, by virtue of the Employee's unique relationship with the Company pursuant to this Agreement, the Employee will acquire and have access to Confidential Information and will also develop a unique and comprehensive familiarity with the Company and its Business (as defined below) and affiliates, which the Employee would not have otherwise had but for the Employee's employment with the Company, and which the Employee acknowledges are valuable assets of the Company and its affiliates.   The Employee further acknowledges and agrees that the covenants in Section 8 and this Section 9 also are reasonably necessary and appropriate to protect the value of the Company's and its affiliates' goodwill and other assets, including without limitation the goodwill and other assets acquired by the Company pursuant to the transactions contemplated by the Purchase Agreement.   Accordingly, the Employee agrees to undertake the obligations in this Section 9 (in addition to those in Section 8 above), which the Employee acknowledges are reasonably designed to protect the legitimate business interests of the Company and its affiliates, without unreasonably restricting the Employee's post-employment opportunities.

9.2     By the Employee's execution of this Agreement, the Employee hereby agrees to abide by the Intellectual Property Agreement attached as Schedule 5 hereto and hereby made a part of this Agreement.

9.3     Except as expressly authorized by the Company in furtherance of the Employee's employment duties, the Employee shall not, at any time during the

Employee's employment and for twenty-four (24) months after the termination thereof by either party for any or no reason, directly or indirectly (whether as a sole proprietor, owner (whether of equity, debt or other interests), employer, partner, investor, shareholder, member, employee, consultant or otherwise):

(a)    Engage in or assist any other person or entity in engaging in a business which provides investors with the opportunity to participate in the returns from investments linked to elemental and non-elemental catastrophe and non-cat reinsurance or retrocessional risks anywhere in the world by investing in fully collateralised reinsurance agreements, treaties or retrocessional agreements and any other types of contracts as carried on by the Company or any of its subsidiaries at the date of this Agreement or at the time of any termination of the Employee's employment for any or no reason (the "Business"), perform services involving the Business in any executive, managerial, sales, marketing, research or other competitive capacity for any person or entity engaged in the Business, or provide material financial assistance involving the Business to any person or entity engaged in the Business; or

(b)    perform services or provide products relating to and competitive with the Business for or to, or accept or facilitate the acceptance of orders or instructions relating to and competitive with the Business from, any Ceding Insurer Client or Investor or Prospective Ceding Insurer Client or Investor (as defined below); or

(c)    solicit any Ceding Insurer Client or Investor or Prospective Ceding Insurer Client or Investor for the purpose of performing or providing or facilitating the performance or provision of any services or products, or accepting or facilitating the acceptance of orders or instructions, relating to and competitive with the Business; or

(d)    induce, solicit, or attempt to persuade any employee, consultant or other agent of the Company or any of its affiliates engaged in the Business (i) who worked in any executive, managerial, sales, marketing, research or other competitive capacity (and not including a purely ministerial, facilities maintenance or other similar role not involving use of or access to Confidential Information), (ii) who used or had access to Confidential Information, or (iii) with whom the Employee had material dealings, in each case at any time during the twelve (12) month period prior to the Employee's termination of employment, to terminate his, her or its employment, consultancy or other relationship or association with the Company or any such affiliate in order to enter into any employment or consulting relationship with or perform services for any other person or entity anywhere in the Territory; or

(e)    induce, solicit, or attempt to persuade any supplier, vendor or other person or entity with which the Company or any of its affiliates engaged in the Business has a business relationship to terminate, restrict or otherwise modify its business relationship with the Company or its affiliates.

9.4    Notwithstanding the foregoing, nothing in this Section 9 shall prohibit the Employee from owning not in excess of two percent (2%) in the aggregate of any class of capital stock or other ownership interests of any company if such stock or other ownership interests are publicly traded and listed on any national or regional stock exchange.

9.5    As used in this Section 9:

(a)    "Ceding Insurer Client or Investor" means any ceding insurer client of the Company or any of its affiliates, any investor in any collective investment scheme then managed or operated by the Company or any of its affiliates, or any person or entity whose investment portfolio or assets are or were managed by the Company or any of its affiliates, in each case with respect to whom, at any time during the twenty-four (24) month period preceding the termination of the Employee's employment, the Employee: (i) had material business dealings, or (ii) acquired or had access to Confidential Information, in each case in the course of the Employee's employment with the Company or any of its affiliates.

(b)    "Prospective Ceding Insurer Client or Investor" means any person or entity other than a Ceding Insurer Client or Investor with respect to which, at any time during the twelve (12) month period preceding the termination of the Employee's employment, the Employee: (i) submitted or assisted in the submission of a presentation or proposal of any kind in respect of the management of its insurance or reinsurance exposures or its investment portfolio or assets, as applicable, or (ii) had substantial contact or acquired or had access to Confidential Information, in each case as a result of or in connection with the Employee's employment with the Company or any of its affiliates.

9.6    The parties agree that in the event any of the prohibitions or restrictions set forth in Section 8 or this Section 9 (including without limitation in Schedule 5) are found by a court of competent jurisdiction to be unreasonable or otherwise unenforceable, it is the purpose and intent of the parties that any such prohibitions or restrictions be deemed modified or limited so that, as modified or limited, such prohibitions or restrictions may be enforced to the fullest extent possible.

9.7    The Employee acknowledges and agrees that a breach of any provision of this Section 9 (including without limitation any provision of Schedule 5) will result in immediate and irreparable harm to the Company and its affiliates for which full damages cannot readily be calculated and for which damages are an inadequate remedy. Accordingly, the Employee agrees that the Company and its affiliates shall be entitled to injunctive relief to prevent any such actual or threatened breach or any continuing breach by the Employee (without posting a bond or other security), without limiting any other remedies that may be available to them. The Employee further agrees to reimburse the Company and its affiliates for all costs and expenditures, including but not limited to reasonable attorneys' fees

-8-

and court costs, incurred by any of them in connection with the successful enforcement of any of their rights under Section 8 or this Section 9 (including without limitation Schedule 5).

9.8 The parties agree that the periods referred to in Section 9.3 above will be reduced by one (1) day for every day, during which, at the Company's direction, the Employee has been excluded from the Company's premises and has not carried out any duties as garden leave pursuant to Section 10.5 below.

10. **Termination**

10.1 The Company may terminate the employment of the Employee under this Agreement immediately (hereafter for "Cause") by summary notice given by the Company if the Employee shall have:

   (a)   been convicted of any criminal offence, other than an offence under the Road Traffic Act 1947 not involving a sentence of imprisonment; or

   (b)   been guilty of material misconduct or material default in the course of the Employee's employment, or if the Employee committed any serious breach, or (after written warning) any repeated or continued breach of any of the Employee's duties and obligations as an employee; or

   (c)   been censured or fined by any Regulatory Organisation that will, or are likely to, restrict the Employee's ability to conduct insurance and reinsurance business for the Company.

10.2 For the avoidance of doubt, in case of summary termination under Sections 10.1(a) through (c) above, the Employee shall not be entitled to the Employee's notice entitlement (as set forth in Section 10.3 below) or payment in lieu (as set forth in Section 10.4 below).

10.3 Except as provided in Section 10.1 above, the Employee's employment under this Agreement shall be terminable at any time during the Term by three (3) months' written notice given by the Employee to the Company, or by or on behalf of the Company to the Employee.

10.4 The Company reserves the option to terminate the Employee's employment under Section 10.3 above immediately upon written notice by paying the Employee an amount equal to the Employee's prorated base annual salary in lieu of any ungiven part of the Employee's notice entitlement, whichever party may have given such notice. The Employee will not, under any circumstances, have any right to payment under this Section 10.3 or otherwise in lieu of notice unless the Company has expressly exercised its option to pay in lieu of written notice to the Employee.

10.5 In the event that either party gives notice of early termination pursuant to Section 10.3, the Company reserves the right to place the Employee on garden leave by requiring the Employee not to attend work and/or not to undertake all or any of the Employee's duties hereunder, provided always that the Company shall continue to pay the Employee's salary and contractual benefits

for such period. This clause shall not affect the general right of the Company to suspend the Employee during any period in which the Company is carrying out a disciplinary investigation into any alleged acts or defaults of the Employee.

11. **Consequences of termination**

Upon termination of the Employee's employment howsoever arising, the Employee will:

(a) Without prejudice to any rights the Employee may have to claim compensation or damages for loss of office, resign any directorship of the Company or any of its affiliates which the Employee holds, and should the Employee fail to do so the Board is irrevocably authorised to appoint another director to act as the Employee's attorney in the Employee's name and on the Employee's behalf and to sign any documents or do any acts or things necessary or requisite to effect such resignations; and

(b) deliver to the Company any property of the Company or its affiliates which may be in the Employee's possession or under the Employee's control, including but not limited to minutes, memoranda, correspondence, slips, lists, notes, records, or other documents and any copies thereto (in whatever form held and whether or not held on computer disk) relating to the business, property, customers or other affairs of the Company or any of their clients or investors in the investment funds of the Company, and further including without limitation all Confidential Information.

(c) The Employee's eligibility for certain Incentive Compensation (or a portion thereof), if any, in connection with a termination of the Employee's employment is governed by and subject to the terms and conditions set forth in Schedule 2.

(d) Any termination of the Employee's employment due to the expiration of the Term shall not entitle the Employee to any amounts or benefits, except as otherwise expressly provided in Schedule 2.

12. **Notices**

Any notice, request or other communication required or permitted to be given hereunder shall be made to the following addresses or to any other address designated by either of the parties hereto by notice similarly given: (a) if to the Company, to Markel Corporation, 4521 Highwoods Parkway, Glen Allen, VA 23060, United States of America, Attention: Richard R. Whitt III, email: rwhitt@markelcorp.com, fax: (804) 527-3810, with a copy to Markel Corporation, 4521 Highwoods Parkway, Glen Allen, VA 23060, United States of America, Attention: Richard R. Grinnan, email: rgrinnan@MarkelCorp.com, fax: (804) 527-3810; and (b) if to the Employee, to the Employee's address listed on Schedule 1. All such notices, requests or other communications shall be sufficient if made in writing either (i) by personal delivery to the party entitled thereto, (ii) by facsimile with confirmation of receipt or by email, (iii) by certified mail, return

receipt requested, or (iv) by express courier service, and shall be effective upon personal delivery, upon confirmation of receipt of facsimile transmission, upon email transmission, upon the fourth calendar day after mailing by certified mail, or upon the second calendar day after sending by express courier service.

13. **Continuing obligations**

The expiration or termination of this Agreement howsoever arising shall not operate to affect such of the provisions of this Agreement as are expressed to operate or have effect thereafter, including without limitation Sections 8 and 9 and Schedules 3 through 5.

14. **No Interference**

Notwithstanding any other provision of this Agreement, nothing in this Agreement shall prohibit the Employee from confidentially or otherwise (without informing the Company or its affiliates) reporting possible violations of law or regulation to any Regulatory Organisation or other governmental entity, participating in a Regulatory Organisation or other governmental investigation, or giving truthful testimony or disclosures to a Regulatory Organisation or other governmental entity, or if properly subpoenaed or otherwise required to do so under applicable law or regulation.

15. **General**

15.1   As of the Effective Date, this Agreement, including any Schedules referred to in it, sets out the whole agreement between the parties relating to the Employee's employment and supersedes all prior or contemporaneous negotiations, understandings or agreements between the parties, whether written or oral, with respect to such subject matter, including without limitation the Employee's offer letter from the Company dated as of March 24, 2016 concerning her prior employment with the Company in the United States and the supplemental letter amendment thereto dated as of December 21, 2016; provided, however, that the Employee's Business Protection Agreement with the Company dated as of May 2, 2016 and her Sign-On Bonus and Reimbursement Agreement with the Company dated as of March 23, 2016 shall continue in full force and effect in accordance with their respective terms and the Employee shall continue to comply with such agreements (for avoidance of doubt, the Employee's relocation to Bermuda and commencement of employment under this Agreement shall not be considered a termination of her employment with the Company for purposes of either such agreement).

15.2   Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law (after any appropriate modification or limitation pursuant to Section 9.6), such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

16. **Law**

    This Agreement shall be governed by and construed in accordance with Bermuda Law and the parties subject to the exclusive jurisdiction of the Bermuda Courts.

17. **Special Variations**

    Each of the terms and conditions of this Agreement shall be subject to the express special variations contained in Schedule 1, which special variations shall, to the extent inconsistent with the other provisions of this Agreement, be of overriding effect.

18. **Effective Date**

    Notwithstanding any other provision of this Agreement, this Agreement shall be effective only upon, and not prior to, the Effective Date, and shall be null and void and of no force and effect if the Effective Date does not occur for any reason, including without limitation if the Employee does not relocate to Bermuda.

## Details of Employment

| | | |
|---|---|---|
| Name and Address | : | Alissa Fredricks.<br>alissa.fredricks@markelcatco.com |
| Position | : | Chief Risk Officer. |
| Commencement Date | : | The commencement date for your employment was May 2, 2016 (the "Commencement Date"). |
| Term | : | The term of this Agreement is for a further twelve (12) month period commencing on the Effective Date (the "Term"). The Term of this Agreement will automatically extend for successive additional twelve (12) month period(s), unless and until terminated pursuant to the Agreement. |
| Place of Work | : | US: from the Commencement Date to the Effective Date.<br><br>Bermuda: as of the Effective Date. |
| Base salary (gross annualized) | : | US $175,000. |
| Housing Allowance | : | US $6,000 gross per month allowance payable monthly in arrears only while the Employee resides in Bermuda. |
| Moving Allowance | : | US $10,000 gross (one-time), payable within thirty (30) days after the Effective Date. |
| Incentive Compensation | : | As set forth in Schedule 2. |

## SCHEDULE 2

## INCENTIVE COMPENSATION

In connection with the Employee's employment with the Company, the Employee shall be eligible to receive incentive compensation to be paid by the Company comprised of a "Continued Service Element" and a "Performance Element" (collectively, "Incentive Compensation"), subject to the terms and conditions of the Agreement including this Schedule 2:

### Definitions

The following terms shall have the following definitions for purposes of this Schedule 2 and the remainder of the Agreement:

- "Fee Income" means the aggregate management fee income, net of introducer fees, rebates and fee sharing arrangements, but before the deduction of the expenses incurred in operating the Company and any funds and insurance companies managed by the Company (collectively, the "Company Group") (including all salary costs and overheads), received by the Company Group over the entire Performance Period (defined below), provided that for purposes of determining Fee Income hereunder, the Company shall disregard any fee income attributable to the business operations of any entity acquired by the Company during the Performance Period or to any other unusual or nonrecurring events occurring during such period. The Company's good faith determination of Fee Income shall be final and binding for purposes of determining the Employee's eligibility for, and the amount of, any Performance Element.

- "Incapacity" means such physical or mental condition of the Employee which renders or is expected to render the Employee incapable of performing the essential functions of the Employee's position hereunder with (to the extent required by law) or without reasonable accommodation for ninety (90) consecutive calendar days, or for one hundred twenty (120) calendar days (whether consecutive or not) within any one hundred eighty (180)-calendar-day period (in each case, except as otherwise provided by law), as determined in good faith by the Company upon consultation with a physician selected by the Company in its discretion. The Employee hereby agrees to submit to any reasonable medical examination(s) as may be recommended by the Company for the purpose of determining the existence or absence of Incapacity.

- "Performance Period" means the period that commences on January 1, 2016 and ends on (and including) December 31, 2018.

- "Retention Period" means the period that commences on the Commencement Date and ends on (and including) December 31, 2020.

Continued Service Element

The Employee shall be eligible to receive a total gross aggregate Continued Service Element of the Incentive Compensation over the Retention Period in an amount equal to US $608,625. The Employee acknowledges and agrees that: (a) she already vested on December 31, 2016 in, and already has been paid in full for, US $58,625 of this total gross aggregate Continued Service Element (representing a nominal one-year annualized increment thereof of $87,500 for calendar year 2016, prorated based on the Employee's U.S. hire date of May 2, 2016) (the "Earned 2016 Payment"), and (b) she shall earn a portion described below of the remaining currently unearned portion of such total gross aggregate Continued Service Element as of the following respective dates (each such date, a "vesting date," and each such payment including the Earned 2016 Payment constituting a "Retention Payment"):

| Vesting Date | Retention Payment Earned on Such Vesting Date |
|---|---|
| • December 31, 2017 | • US $100,000 |
| • December 31, 2018 | • US $125,000 |
| • December 31, 2019 | • US $150,000 |
| • December 31, 2020 | • US $175,000 |

provided in each case that the Employee complies with this Agreement and remains actively and continuously employed in good standing with the Company as of each such applicable vesting date (and subject to the remaining provisions below). Any such earned Retention Payment shall be paid within thirty (30) calendar days after the applicable vesting date upon which it becomes earned.

Performance Element

The Employee shall be eligible to receive a total gross aggregate target Performance Element of the Incentive Compensation based on Fee Income received during the Performance Period, provided that the Employee complies with this Agreement and remains actively and continuously employed in good standing with the Company throughout the Performance Period (and subject to the remaining provisions below).

The Performance Element for which the Employee is eligible shall be calculated as follows:

(i) US $175,000 multiplied by (ii) the quotient of Fee Income divided by $81,000,000.

(i.e., US $175,000 x (Fee Income / $81,000,000))

Any Performance Element of the Incentive Compensation that becomes earned and payable hereunder shall be paid within thirty (30) calendar days after the last day of the Performance Period.

Termination Provisions

Notwithstanding the foregoing:

(a)   in the event the Company terminates the Employee's employment without Cause (and not due to Incapacity or death), in each case with an effective termination date occurring prior to the last day of the:

     (i)  Retention Period, the Employee shall be deemed to have earned any and all then-unearned and unpaid Retention Payments as of such effective employment termination date, which shall then be paid to the Employee within thirty (30) calendar days after such effective employment termination date; and

     (ii) Performance Period, the Employee shall remain eligible to receive the Performance Element (to be calculated and determined as provided above) as if the Employee's employment had continued in good standing through the end of the Performance Period (provided, however, that the Employee continues to comply with this Agreement). Any Performance Element of the Incentive Compensation that becomes earned and payable hereunder shall be paid within thirty (30) calendar days after the last day of the Performance Period.

(b)   in the event the Employee's employment terminates due to the Employee's Incapacity or death with an effective termination date occurring prior to the last day of the:

     (i)  Retention Period, the Employee shall be deemed to have earned a pro-rated portion of the Continued Service Element of the Incentive Compensation calculated as (x) US $608,625 multiplied by (y) a fraction, the numerator of which is the number of completed calendar months during which the Employee was actively and continuously employed during the Retention Period (for avoidance of doubt, and solely for this calculation, as if the Commencement Date had been May 1, 2016) and the denominator of which is fifty-six (56), reduced by (z) any and all Retention Payments then already paid to the Employee. Any such pro-rated portion of the Continued Service Element shall be paid to the Employee or in the case of death, to the Employee's personal representative within thirty (30) calendar days after such effective employment termination date; and

     (ii) Performance Period, the Employee shall not be entitled to, or receive, any Performance Element of the Incentive Compensation (or any portion thereof).

(c)   in the event the Company terminates the Employee's employment for Cause, or the Employee resigns for any or no reason, in each case with an effective employment termination date prior to the last day of the Retention Period or the

Performance Period, as applicable, or in the event the Employee at any time breaches any of the Employee's continuing post-employment obligations under the Agreement, the Employee shall not be entitled to, or receive, any then-unearned or unpaid Retention Payments or any Performance Element of the Incentive Compensation (or any portion thereof).

(d) In the event the Term continues beyond the end of the Retention Period, then the Employee shall be eligible to participate as of the time (and not before) in the then-effective Company incentive plan applicable to similarly situated employees of the Company, as in effect or amended from time to time.

(e) Any and all entitlements, whether contractual or otherwise, to payments relating to termination, including but not limited to payments in lieu of notice (whether pursuant to Section 10.4 or otherwise), or to severance payments (whether contractual or statutory), shall be offset against any and all payments made pursuant to these Termination Provisions.

## SCHEDULE 3

### Promotion and Protection of Business

### Further Acknowledgements

The Employee confirms that following termination of this Agreement, and subject in each case to Section 14 of the Agreement:

(i)     the Employee will not except as required by law or Regulatory Organisation say or do anything which may damage in any manner the repute of the Company, or which may damage any business relationships or connections of the Company.

(ii)    Subject to the Company reimbursing the Employee for any monies lost by the Employee by virtue of offering such co-operation, the Employee will continue hereafter to co-operate fully and assist the Company (and their respective professional indemnity insurers) in respect of any Insurance business with which the Employee was involved in whilst acting as an employee or representative of the Company.

## SCHEDULE 4

### "Confidential Information"

"Confidential Information" as used in this Agreement including any Schedules thereto means all confidential competitively sensitive and proprietary information or materials relating or belonging to the Company or any of its affiliates (in whatever form, whether or not reduced to writing, whether held in hard copy or any electronic medium, and whether or not acquired by the Company pursuant to the Purchase Agreement or otherwise acquired or developed), including without limitation all confidential or proprietary information furnished or disclosed to or otherwise obtained by the Employee in the course of the Employee's employment with the Company or any of its affiliates, and further includes without limitation: computer programs; patented or unpatented inventions, discoveries and improvements; marketing, organizational, management, operating and business plans and strategies; research and development; policies and manuals; sales forecasts; information concerning actual or potential regulatory, legal, compliance, professional indemnity claims or investigations involving the Company or any of its affiliates; employee personnel file and medical file information; pricing and nonpublic financial information; current and prospective ceding insurer client, investor and agent lists and information on or belonging to ceding insurer clients, investors and agents or their employees; information concerning planned or pending acquisitions, investments or divestitures; and information concerning purchases of major equipment or property. "Confidential Information" does not include information that lawfully is or becomes generally and publicly known outside of the Company and its affiliates other than through the Employee's breach of this Agreement or breach by another person or entity of some other obligation.

## INTELLECTUAL PROPERTY AGREEMENT

As a material part of the consideration for my employment by Markel CATCo Investment Management Ltd. ("Company") and the salary and other compensation that I, Alissa Fredricks, shall receive during my employment, I acknowledge and agree that, by my signature on the Employment Agreement ("Employment Agreement") to which this Intellectual Property Agreement ("Agreement") is attached as Schedule 5, I also agree to this Agreement's terms, which are deemed incorporated into and a part of the Employment Agreement:

1. (a) Company owns the sole and exclusive right, title and interest in and to any and all Works (as defined below), including without limitation any and all source code or other intellectual property and further including without limitation all copyrights, trademarks, service marks, trade names, slogans, patents, ideas, designs, concepts and other proprietary rights. Company's right, title and interest in and to the Works includes without limitation the sole and exclusive right to secure and own copyrights and maintain renewals throughout the world, and the right to modify and create derivative works of or from the Works without any payment of any kind to me. I agree that the Works shall be "work made for hire" as that term is defined in the copyright laws of the United States, and not works of joint ownership. To the extent that any of the Works is determined not to constitute work made for hire, or if any rights in any of the Works do not accrue to Company as a work made for hire, my signature on the Employment Agreement constitutes an assignment (without any further consideration) to Company of any and all of my respective copyrights and other rights, title and interest in and to all Works. I will disclose promptly to Company all Works, whether or not they are patentable, copyrightable or subject to trade secret protection.

(b)   I will provide any assistance reasonably requested by Company to obtain United States and non-United States letters patent and copyright registrations covering inventions, original works of authorship and other Works belonging or assigned hereunder to Company. I will execute any transfers of ownership of letters patent or assignments of copyrights or other proprietary rights transferred or assigned hereunder (including without limitation short form assignments intended for recording with the U.S. Copyright Office, the U.S. Patent and Trademark Office, or any other person or entity). I understand that my obligations under this Section 1(b) shall survive any termination of this Agreement or of my employment by Company in perpetuity, provided that Company will compensate me at a reasonable rate for time actually spent performing such obligations at Company's request after any such termination. If Company is unable for any reason whatsoever, including my mental or physical incapacity, to secure my signature to apply for or to pursue any application for any United States or non-United States letters patent or copyright registrations or on any document transferring or assigning any patent, copyright or other proprietary right that I am obligated hereunder to transfer or assign, I hereby irrevocably designate and appoint Company and its duly authorized officers and agents as my

agent and attorney in fact, to act for and on my behalf and in my stead to execute and file any such applications and documents and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent or copyright registrations or transfers or assignments thereof or of any other proprietary rights with the same legal force and effect as if executed by me. This appointment is coupled with an interest in and to the inventions, works of authorship, trade secrets and other Works to which any proprietary rights may apply and shall survive my death or disability.

(c)   As used in this Agreement, "Works" means (i) any inventions, developments, improvements, trade secrets, ideas or original works of authorship that I conceive, create, develop, discover, make, acquire or reduce to practice in whole or in part, either solely or jointly with another or others, during or pursuant to the course of my employment by Company or any of its affiliates or their respective businesses, or to Company's or any of its affiliates' actual or demonstrably anticipated research or development, (ii) any inventions, developments, improvements, trade secrets, ideas or original works of authorship that I conceive, create, develop, discover, make, acquire or reduce to practice in whole or in part, either solely or jointly with another or others, during or pursuant to the course of my employment by Company or any of its affiliates and that are made through the use of any of Company's or any of its affiliates' equipment, facilities, supplies, trade secrets or time, or that result from any work performed for Company or any of its affiliates, and (iii) any part or aspect of any of the foregoing.

2. I have been notified by Company, and understand, that the foregoing provisions of Section 1 do not apply to an invention for which no equipment, supplies, facilities or trade secret information of Company or any of its affiliates was used and which was developed entirely on my own time, unless: (a) the invention relates (i) to the business of Company or any of its affiliates or (ii) to Company's or any of its affiliates' actual or demonstrably anticipated research and development, or (b) the invention results from any work performed by me for Company or any of its affiliates. I have listed and described on an attached page all inventions of my own to which I claim Section 1 does not apply. If no such page is attached and signed by me and an authorized Company representative, no such inventions exist.

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the year and day first above written.

**Markel CATCo Investment Management Ltd.**

By: _____

**Alissa Fredricks**

By: _____